Decided 22 May, 1899.

### STATE v. MAGERS.

[57 Pac. 197.]

1. INSTRUCTION AS TO TIME OF SUNSET*—JUDICIAL KNOWLEDGE.—A witness testified that on the day of the homicide, "at twilight or dusk, being about fifteen minutes after sundown," he saw defendant and deceased together in a buggy. Other evidence showed that the team and buggy were not taken from the stable by defendant and the deceased until 7:30 P. M., which time was, in fact, more than an hour after the sun had set. Under these circumstances the court should have stated the hour of sunset to the jury, so that they might have considered that fact in determining whether the witness was correct in saying he recognized the persons in the buggy. Especially is this proper in view of Sections 707, 708, Hill's Ann. Laws, directing courts to take judicial notice of the measure of time, and section 242, requiring such knowledge to be declared to the jury.

*NOTE.—The adoption by the railroads and most municipalities and communities in this country of the so-called "standard time" has caused some interesting discussions as to whether sun or standard time is meant when neither is specially designated. In the following cases it was held error to use standard time as a basis of computation : *Henderson* v. *Reynolds*, 84 Ga. 159 (7 L. R. A. 327, 10 S. E. 734); *Searles* v. *Averhoff*, 28 Neb. 668 (44 N. W. 872); *Jones* v. *German Ins. Co.*, 46 L. R. A. 860 (81 N. W. 188).—REPORTER.

2. APPLICATION OF RULES OF COURT.—A rule of court requiring requests for
   special instructions on questions of law to be submitted before the argument
   begins does not apply to instructions on the facts.

3. EVIDENCE OF FACTS JUDICIALLY NOTICED.—It is not necessary to offer evi-
   dence of facts of which judicial notice is taken by the courts.

4. HOMICIDE—DUTY TO INSTRUCT ON MANSLAUGHTER.—Where circumstantial
   evidence alone is relied on to prove defendant's connection with a homicide,
   and there is no evidence of the manner of the killing, the law of manslaughter
   should be stated to the jury.

5. WITNESS REFRESHING MEMORY FROM MEMORANDA.—It is competent for a
   witness, before testifying, to refresh his memory from memoranda of a con-
   versation, though they were not made by him but by another person who was
   present: *State* v. *Moran*, 15 Or. 262; *State* v. *Bartmess*, 33 Or. 110, applied.

From Polk.: GEO. H. BURNETT, Judge.

W. G. Magers was convicted of murder in the first
degree, and appealed.                          REVERSED.

For appellant there was a brief over the name of *Wil-
liam H. Holmes*, with an oral argument by *Mr. Holmes*
and *Mr. John J. Daly*.

For the state there was a brief over the names of *D. R.
N. Blackburn*, Attorney-General, *Samuel L. Hayden*, Dis-
trict Attorney, and *John H. Hall*, with an oral argument
by *Mr. Hayden* and *Mr. Hall*.

MR. JUSTICE MOORE delivered the opinion of the court.

This is an appeal from a judgment of death pronounced
by the circuit court for Polk County against the defend-
ant W. G. Magers, upon his conviction of the crime of
murder in the first degree, alleged to have been com-
mitted by killing one Andrew Raymond Sink.   The as-
signment of error chiefly relied upon for reversal relates
to the action of the trial court in refusing to declare to
the jury when the sun set on September 13, 1898.   It is
deemed necessary to a proper understanding of the point
insisted upon to state a portion of the evidence which

might be considered as tending to connect the defendant with the commission of the crime. It appears that on the day in question the defendant and the deceased rode in a top buggy, drawn by a gray and a bay horse, from Gervais to Salem, where they left the team at a feed stable until about 7 : 30 o'clock that evening, when they took it away, saying they intended to drive a short distance, but would soon return ; that about 11 o'clock that night the defendant took the team to another stable in Salem, where it remained about thirty minutes, when he took it away and drove to Gervais ; that one week thereafter the body of the deceased was found in the Willamette River, a short distance below the steel bridge at Salem, having iron weights tied to the hands and feet, and contused wounds, apparently made with some blunt instrument, on the forehead and the mouth, either of which might have produced death, and a deep, incised wound, apparently made with some sharp instrument, on the right side of the neck, severing the carotid artery and the jugular vein, and having the pockets in the clothing on the body turned inside out. These weights having been identified as the property of one E. E. Harritt, a farmer living in Polk County, about one and one-half miles north of the steel bridge, who used them in operating an automatic gate, one William Sparr was called as a witness by the state, and testified that on September 13, 1898, "at twilight or dusk, being about fifteen minutes after sundown," as he was loading wood upon a wagon which stood beside the county road leading from Salem to Lincoln, in said county, at a point about two hundred or three hundred yards from Harritt's gate, and about ten rods from a lane leading from said highway to the Willamette River, two men, whom he described, drove rapidly past, having a gray and a dark-colored or bay horse hitched to a top buggy, with the curtains but-

toned down, and turned from the highway into said lane; and the witness, looking at the defendant, and having 'seen the body of the deceased at the morgue, stated that he thought they were the persons whom he saw on the occasion to which he referred.

1.  Before the defendant's evidence was concluded, his counsel gave notice that they considered it incumbent upon the court to tell the jury when the sun set on the day of the alleged homicide, promising to prepare a written declaration of the fact for the court; and, while counsel for the state was making the first argument to the jury, defendant's counsel handed to the court the form of the declaration they wished made to the jury, as follows : "It is a matter of general information, which it becomes my duty to declare to you, that the sun set at 6 o'clock and fifteen minutes on the evening of September 13th last." But, considering the request as not being made within the time prescribed by its Rule No. 13, which reads as follows : "If either party desires the court to give special instructions to the jury on any question of law, he must, unless the court shall otherwise direct at the commencement of the trial, submit such instructions in writing to the court before the first argument is begun, and each instruction must be separately numbered,"—the court refused to make the declaration, whereupon an exception was saved. It is contended that, Sparr having testified that the two men drove along the highway at about fifteen minutes after sundown, and inasmuch as the evidence tended to show that the team was not taken from the stable by the defendant and the deceased until more than one hour thereafter, the setting of the sun became material, and the court should have declared to the jury the time when it occurred, to enable them to determine Sparr's credibility as to the identity of the persons whom he saw, notwithstanding he stated

that it was at twilight or dusk, and that the court's refusal in this respect was error. The statute makes the knowledge of the court a species of evidence (Hill's Ann. Laws, § 668), and provides that, without the production of any evidence thereof, the court will take judicial notice, *inter alia*, of the measure of time, and, for the purpose of obtaining the desired information, may resort to appropriate books or documents of reference (Hill's Ann. Laws, §§ 707, 708), and that, whenever the knowledge of the court is thereby made evidence of a fact, the court is to declare such knowledge to the jury, who are bound to accept it as conclusive (Hill's Ann. Laws, § 242).

In *People* v. *Kee*, 61 Cal. 404, the prosecuting attorney was permitted to read from Ayer's Almanac to prove when the sun rose on the day of the commission of an alleged offense, and it was held that, inasmuch as the court was obliged to take judicial notice of the rising of the sun, no error was committed. Mr. Justice McKEE, speaking for the court, says : "The fact for the proof of which the almanac was offered was one of those facts of which a court may take judicial notice. Formal proof of it was therefore unnecessary. It would have been sufficient to have called it to the knowledge of the judge at the trial ; and if his memory was at fault, or his information not sufficiently full and precise to induce him to act upon it, he had the right to refer to an almanac, or any other book of reference, for the purpose of satisfying himself about it, and such knowledge would have been evidence." In *State* v. *Morris*, 47 Conn. 179, the defendant being upon trial for burglary, the state was permitted to offer in evidence an almanac for the purpose of showing at what hour the sun set on the day when the crime was alleged to have been committed ; and it was held that its admission was not prejudicial, the court saying :

"The time of the rising or setting of the sun on any given day belongs to a class of facts, like the succession of the seasons, changes of the moon, days of the month and week, etc., of which courts will take judicial notice. The almanac in such cases is used, like the statute, not strictly as evidence, but for the purpose of refreshing the memory of the court and jury." In *Case* v. *Perew,* 46 Hun, 57, Jayne's Almanac was offered in evidence for the purpose of showing when the moon rose on the night of October 2, 1881 ; and it was held that, inasmuch as the court was bound to take judicial notice of the time when the moon rises and sets on the several days of the year, no error was committed. In *Munshower* v. *State,* 55 Md. 11 (39 Am. Rep. 414), it was held that an almanac was admissible in evidence to prove at what hour the moon rose on a given night. In *Allman* v. *Owen,* 31 Ala. 167, it was held that courts will take judicial notice of the coincidence of the days of the month with the days of the week, as shown in the almanac. To the same effect, see 12 Am. & Eng. Enc. Law (1 ed.), 195 ; 1 Wharton, Ev. § 282 ;  Best, Ev. § 254.

"Twilight" is defined in Webster's International Dictionary to be : "The light perceived before the rising, and after the setting, of the sun, or when the sun is less than eighteen degrees below the horizon, occasioned by the illumination of the earth's atmosphere by the direct rays of the sun, and their reflection on the earth." The length of twilight necessarily depends upon the time of the year, and the distance from the equator. At the summer solstice, twilight lengthens in northern latitudes as the distance from the equator increases, until a point is reached at which it lingers from the setting to the rising of the sun. Considering the words "twilight" and "dusk" as synonymous, the terms so used are qualified by the sentence, "being about fifteen minutes after sun-

down ;" and, while it might have been possible for Sparr to recognize the persons whom he saw at the time the team could reasonably have been driven from Salem to the point where he was working, which must necessarily have required several minutes, the witness having definitely fixed the time at more than one hour prior to the time when the evidence tends to show that the team was taken from the stable, we think it was the duty of the court, when so requested, to declare to the jury at what hour the sun set on that particular day, that they might be able intelligently to judge of the credibility of the witness, and of the possibility of his being able to identify the men at the time he saw them.

2.   Defendant's failure to prepare the written announcement until after the evidence was closed furnished no justification for denying the request, for defendant's counsel, having given notice of their desire to have the court make the required declaration before concluding the evidence in his behalf, did all that was required of them, in our judgment, to call the matter to its attention.   It will be remembered that Rule 13 of the circuit court applies to special instructions upon matters of law, and, as the declaration so requested related to a question of fact only, it is apparent that the rule does not conflict with the announcement which the court should have made.

3.   No evidence of the time when the sun set was offered, but, since the court is permitted to seek information of this character from books of reference, evidence of the facts of which the court will take judicial notice need not be produced :   Hill's Ann. Laws, § 707; 12 Am. & Eng. Enc. Law (1 ed.), 151 ;   *State v. Morris,* 47 Conn. 179.

4.   Inasmuch as a new trial must be had, it is deemed essential to consider other alleged errors.   The court having instructed the jury that they might find the defendant guilty of murder in the first or second degree, or that

they might return a verdict of not guilty, an exception was saved to that portion of the charge, and it is contended that the court erred in failing to tell the jury that they might find the defendant guilty of manslaughter. The bill of exceptions does not purport to contain all the evidence, in the absence of which it would ordinarily be presumed that no testimony was introduced tending to show that the killing occurred in the heat of passion, or under such circumstances as would reduce the grade of the offense to manslaughter, and, this being so, that no error was committed in failing to instruct upon the law applicable to the lesser crime : *State* v. *Lee Yan Yan*, 10 Or. 365. It was admitted at the trial, however, that all the evidence from which the degree of criminal intent might be inferred was included in the record ; and upon this concession, and upon the assumption that the evidence which will probably be produced at the new trial will be the same as that contained in the bill of exceptions, we shall examine the law applicable to the grade of the offense, as far as it can be ascertained from an inspection of the evidence in regard to the condition of the body of the deceased and the circumstances of the killing.

The evidence, as far as it tends in any manner to connect the defendant with the commission of the crime, except that the deceased was last seen alive in his company, is wholly circumstantial ; and, this being so, in discussing the grade of the offense we shall assume, as the defendant contended, that some other person is responsible for the killing. While it is barely possible that the wounds found upon Sink's body might have resulted from his precipitation from the bridge, the fact that his hands were tied gives rise to the inference that his life was taken by human agency, and that his body was thrown into the river to hide the evidence of a grave crime. If a person, without previous preparation, take

the life of another, whose body he conceals, proof of the hiding will be presumed to be adverse to such person (Hill's Ann. Laws, § 776, subd. 5); yet the suppression of the evidence of the offense does not necessarily prove that the killing was done with malice. "For instance," says Mr. Justice Breaux, in *State* v. *Thomas* (La.), 23 South. 250, "in case of manslaughter, the slayer may seek to conceal the body of his victim, without its being evidence of the previous intent to murder." The jury, in all cases of homicide, are called upon to determine the animus with which the killing was accomplished, at the instant the means were used by which death resulted. The fact that the pockets of the deceased were apparently turned inside out, from which it might be inferred that the clothing had been searched for valuables, does not necessarily prove that the deceased was killed for gain, for the slayer might never have thought of his victim's property until he discovered that he was dead.

In the celebrated case of *Commonwealth* v. *Webster*, 5 Cush. 295 (52 Am. Dec. 711), circumstantial evidence was relied upon to establish the defendant's guilt, notwith-standing which Mr. Chief Justice Shaw instructed the jury upon the law applicable to manslaughter as well as to murder, but in doing so said : "We have stated these distinctions, not because there is much evidence in the present case which calls for their application, but that the jury may have a clear and distinct view of the leading principles in the law of homicide. There seems to have been little evidence in the present case that the parties had a contest. There is some evidence tending to show the previous existence of angry feelings ; but unless these feelings resulted in angry words, and words were fol-lowed by blows, there would be no proof of heat of blood in mutual combat, or under provocation of an assault, on the one side or the other, and the proof of the defend-

ant's declarations as to the circumstances under which the parties met and parted, as far as they go, repel the supposition of such a contest.'' In *Rutherford* v. *Commonwealth*, 13 Bush, 608, the plaintiff in error was convicted of murder upon circumstantial evidence; but, the trial court having failed to instruct the jury upon the law applicable to manslaughter, the judgment was reversed. Mr. Justice COFER, speaking for the court in deciding the case, says: ''The homicide may, then, have been excusable self-defense, manslaughter, or murder. The facts attending the killing must be ascertained, in order to ascertain to which category the killing belongs. It is the province of the jury to ascertain these facts, and the court erred in refusing to instruct in the law of manslaughter. In doing so the court took upon itself to decide that no facts existed which could reduce the killing to manslaughter. That action, as stated by the learned judge, was based on the ground that there was no evidence whatever 'going to show that the killing was done in sudden heat and passion,' and therefore an instruction as to the law of manslaughter would be abstract and misleading. The same reasoning would equally apply to an instruction in regard to the law of self-defense, and the instruction given on that subject might have been refused with equal propriety. If the jury had a right, from the circumstances in evidence before them, to inquire whether the killing was done in self-defense, they had an equal right to inquire whether it was not done under circumstances which made it manslaughter. When no witness introduced on the trial saw the homicide committed, or saw the parties after they met on the occasion when the killing occurred, the law applicable to murder, manslaughter, and self-defense should be given, in order to meet any state of fact the jury may find, from the circumstances in evidence, to have existed.''

In *Rachford* v. *Commonwealth* (Ky.), 28 S. W. 499, it is held that, where the proof showing the facts attending the killing is wholly circumstantial, the court should instruct on the law applicable to murder, manslaughter, and justifiable homicide. "While it was the duty of the court," says WHITE, J., in *Justice* v. *Commonwealth* (Ky.), 46 S. W. 499, "to give the whole law of the case, this does not extend to giving the law of apparent necessity, unless there was some proof of that fact, or an entire absence of proof as to how death was produced, and only circumstantial evidence relied upon to show the cause." In *Jones* v. *State* (Tex. App.), 15 S.W. 403, a woman's dead body having been found in a thicket, with her throat cut, her underlip torn, and teeth dislocated, the plaintiff in error was indicted for killing her, and, upon trial, was convicted of murder in the first degree. The evidence relied upon to establish his guilt was wholly circumstantial, and tended to show that the place where the body lay bore indications of a struggle between the deceased and her slayer ; that, the day after the body was discovered, it was noticed that one of defendant's fingers appeared to have been caught between some one's teeth, and extricated with great force. It also appeared that a coat belonging to the defendant, very much torn, was found in his house shortly after the homicide. The court having instructed the jury that they could find a verdict of murder in the first degree only, Mr. Justice WILSON, speaking for the court in reversing the judgment, says : "While we do not question the sufficiency of the evidence to warrant a conviction of murder in the first degree, we do say that, in our judgment, it presents the issues, also, of murder in the second degree and of manslaughter, and that these issues should have been submitted to the jury, with appropriate instructions." In *Aguilar* v. *Territory*, 8 N. M. 496 (46 Pac.

342), circumstantial evidence was relied upon to connect
the plaintiff in error with the killing of the person whose
body was found, having cuts and bruises on the head and
face; and the jury, in pursuance of the court's instruction
that they could find a verdict of guilty of murder in the
first degree only, returned a verdict of that character, and,
judgment having been rendered thereon, the court, in
reversing it, say : "The record fails utterly to show how
or under what circumstances the killing occurred. The
record fails to show any threats, difficulty, or feeling of
ill will between the deceased and the defendant, or any
of the facts surrounding the commission of the homicide.
Under this state of facts, was the court below correct in
giving an instruction only of murder in the first degree?
We think not. While, from the fact of the killing, and
the nature of the instrument used to produce it, it might
be found that the killing was unlawfully done, and that
it was done with malice aforethought, yet have we the
right, from these facts alone, unaccompanied by any
other circumstances, to presume that it was done with
that deliberation and premeditation which will make it
murder in the first degree? If we can indulge in any
presumption, we have more right to presume that the
killing was done under such circumstances as would
make it justifiable homicide, because nothing is pre-
sumed against the innocence of the accused. Might we
not as well presume that the deceased brought on a
difficulty resulting in his death? Or may we not also
presume that the deceased attacked the slayer under
such circumstances as would make the killing justifiable
homicide? How are we to know, in the absence of any
proof as to the circumstances of the killing, how it was
perpetrated? In the absence of any proof upon the sub-
ject, must we assume that it was the highest degree of
murder? We do not so understand the law. To presume

the guilt of the defendant of murder in the first degree,
in the absence of proof to establish it, is in conflict with
that presumption of innocence which remains with the
defendant until overcome by proof which establishes his
guilt beyond a reasonable doubt.  From the simple fact
of the killing, without any proof as to any of the circum-
stances under which it was done, we have no more right
to assume that it was murder in the first degree than to
assume that it was murder in the second degree or justi-
fiable homicide.''

"The cardinal distinction," says Mr. Justice COLLIER,
in *Territory* v. *Padilla*, 8 N. M. 510 (46 Pac. 346), "between
all homicides not shown by eye-witnesses and homicides
where the killing is shown by eye-witnesses, is that as to
the former class the jury must weigh the circumstances,
and determine what degree of murder is proven, while
as to the latter the court may instruct the jury as to a
single degree, or two degrees, or all the degrees, as, or
not, the evidence may be applicable to one or more de-
grees.  If the secret killing were shown to be by poison
or torture, or necessarily in the commission of, or attempt
to commit, a felony, or by lying in wait, then, also, even
in cases of circumstantial evidence, the court may restrict
instructions to first degree.  If the rule were that every
secret homicide presumes murder in the first degree,
then the slayer of a man whose body is found pierced
by bullets, having in its hand a weapon recently dis-
charged, is placed in the same category as he who has
slain unseen a defenseless woman, whose polluted corpse
bears evidence of the utmost atrocity.  Such a rule is
not reconcilable with reason, of which law should be the
perfection ;  and the only escape from it is for the jury,
and not the judge, to weigh all the circumstances which
may satisfy their minds as to how the secret killing may
have been effected, and determine the degree of the

slayer's guilt." In *State* v. *Mahly*, 68 Mo. 315, the de-
fendant was indicted for killing his stepdaughter, a child
of three years, and at the trial the evidence of the state
tended to show threats made by the defendant against,
and a course of most brutal treatment by him of, the
child, whose body was found lying on the hearth, under
circumstances which showed that death was caused by
burning. The court having instructed the jury that,
upon this and other evidence tending to prove that the
defendant killed the child, they might find him guilty
of murder in the second degree, a verdict of that char-
acter was returned. A judgment having been rendered
thereon, the court, in reversing it, after commenting
upon the acts of torture inflicted upon the child by the
defendant, said: "Courts should not humor or encourage
the sentimentalism of jurors who shrink from finding an
accused guilty of the highest crime of which the evidence
proves him guilty, by giving instructions authorizing
them to find him guilty of a lower grade of which there
is no proof of his guilt. If they have a reasonable doubt
of his guilt of the only crime which the evidence tends to
prove, they should acquit, and not compromise with that
doubt by finding him guilty of a lower grade of offense.
Instructions in regard to the lower grades, not warranted
by the evidence, operate as persuasives to juries to con-
vict of one of those grades when they should convict the
accused of the highest, or acquit him altogether. The
court erred in giving the instruction defining murder in
the second degree, because there was no evidence to sup-
port it." In that case the tender age of the child leaves
no room for inference that her life was taken in self-
defense. Besides, the manner of the killing, though
established by the circumstances of the condition of the
body, seems to be conceded ; and, since death necessarily
resulted from holding the child in the fire, the inference

of malice to be deduced therefrom was irresistible. True, there may be instances in which the only evidence of malice depends upon the proof of certain circumstances tending to show beyond a reasonable doubt that a human life was sacrificed in pursuance of the slayer's prearranged plan, and in such cases no error would probably be committed in the court's failure or refusal to instruct upon the law applicable to manslaughter: *Territory* v. *Padilla*, 8 N. M. 510 (46 Pac. 346). In *Ringo* v. *State* (Tex. Cr. App.), 26 S. W. 73, it was held that where the circumstances tended to show that no struggle had taken place between the slayer and his victim, and the physical facts surrounding the killing showed premeditation, deliberation and cruelty, no error was committed in refusing to charge murder in the second degree.

The statute, Hill's Ann. Laws, § 200, in prescribing the method of giving instructions, reads as follows : "In charging the jury, the court shall state to them all matters of law which it thinks necessary for their information in giving their verdict, but it shall not present the facts of the case, but shall inform the jury that they are the exclusive judges of all questions of fact." Notwithstanding which, the rule is well settled, that on a trial of a person for the crime of murder, if there is no evidence tending to reduce the homicide to manslaughter, it is not incumbent upon the court to charge with reference to the lesser crime; but if there is any evidence, direct or indirect, however slight it may be, that tends in any manner to show that the killing was done in the heat of passion, or under such circumstances as to eliminate the element of malice, prejudicial error is committed if the court fail or refuse to instruct the jury upon the law applicable to manslaughter: Kerr, Hom. § 526; 2 Thompson, Trials, § 2322; *State* v. *Garrand*, 5 Or. 216; *State* v. *Whitney*, 7 Or. 386; *Hart* v. *State*

(Tex. Cr. App.), 44 S. W. 1105; *Stoball* v. *State*, 116 Ala. 454 (23 South. 162); *State* v. *Dickson*, 78 Mo. 438. In *Legg's Case*, Kelyng, 27, decided in 1662, it was held that "if one man kill another, and no sudden quarrel appeareth, this is murder, and it lyeth upon the party indicted to prove a sudden quarrel." The rule announced in that case was approved in 1727, in the case of *Rex* v. *Oneby*, 2 Raym. Ld. 1485. In *Pennsylvania* v. *McFall*, Add. 255, decided in 1794, it was held that every unlawful killing is presumed to be murder, unless the person accused thereof can show. such circumstances as will reduce it to a lower degree of homicide. In *Pennsylvania* v. *Lewis*, Add. 279, decided in 1796, it was held that, although malice was presumed until the want of it was shown, an unlawful killing would not be presumed murder in the first degree. Every homicide, it has been said, is *prima facie* murder, yet, to elevate the offense to the first degree, the burden is cast upon the plaintiff, while the burden is on the prisoner to reduce it to manslaughter : *Hill* v. *Commonwealth*, 2 Grat. 595 ; *McCauley* v. *United States*, 1 Morris, 486 ; *Commonwealth* v. *Drum*, 58 Pa. St. 9 ; *Witt* v. *State*, 6 Cold. 5. The rule thus announced was constantly adhered to until criticised by Mr. Justice WILDE in *Commonwealth* v. *York*, 9 Metc. (Mass.) 93 (43 Am. Dec. 373), in which he maintained that in all criminal cases the burden of proof was on the prosecution, throughout, to make out the whole case. The reason assigned by Mr. Justice WILDE was approved by this court in *State* v. *Whitney*, 7 Or. 386, and *State* v. *Ellsworth*, 30 Or. 145 (47 Pac. 199), where it was, in effect, held that the burden is on the state, not only to prove the homicide, but also to establish the animus with which the killing was accomplished. To the same effect, see *Coffee* v. *State*, 3 Yerg. 283 ; *United States* v. *Mingo*, 2

Curt. 1 (Fed. Cas. No. 15,781); *United States* v. *Armstrong*, 2 Curt. 446 (Fed. Cas. No. 14,467); *United States* v. *McClare*, 17 Law Rep. 439 (Fed. Cas. No. 15,659); *United States* v. *Lunt*, 26 Fed. Cas. 1021 (No. 15,643); *Stokes* v. *People*, 53 N. Y. 164 (13 Am. Rep. 492).

In those jurisdictions in which the rule prevails of imposing upon the accused the burden of proving facts which tend to reduce the grade of the offense below murder in the second degree, the presumption of malice is not invoked, except upon clear proof of the killing by the party charged therewith. Mr. Chief Justice SHAW, in *Commonwealth* v. *York*, 9 Metc. (Mass.) 93 (43 Am. Dec. 373), quoting from Foster's Crown Law, as illustrating this doctrine, says : "In every charge of murder, the fact of killing being first proved, all the circumstances of accident, necessity, or infirmity are to be satisfactorily proved by the prisoner, unless they arise out of the evidence produced against him ; for the law presumeth the fact to have been founded in malice, until the contrary appeareth." In *Commonwealth* v. *Hawkins*, 3 Gray, 463, Mr. Chief Justice SHAW, interrupting defendant's counsel, who was proceeding to argue to the court in support of the dissenting opinion of WILDE, J., in *Commonwealth* v. *York*, said : "The doctrine of *York's Case* was that where the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious, and an act of murder." Where, however, the killing is not proved by any eye-witness to have been done by the party charged therewith, and circumstantial evidence is relied upon to establish his guilt, an instruction to the jury, in the absence of any evidence tending to show the manner of the killing, that they may return a verdict of guilty of murder in the first or second degree only, is to infer from the circumstances that the defendant com-

mitted the act, and from such deduction to presume that the killing was malicious; thus, in violation of our statute (Hill's Ann. Laws, § 772), founding a presumption on an inference instead of a particular fact. The rule to be extracted from these decisions seems to be that if the manner of the killing is unknown, and circumstantial evidence only is relied upon to connect the defendant with the commission of the crime, it is the duty of the court, when so requested, to instruct the jury upon the law applicable to murder in the first degree, murder in the second degree, and manslaughter, and where it appears that the defendant has committed a crime, and there is reasonable ground of doubt in which of two or more degrees he is guilty, he can be convicted of the lowest of these degrees only: Hill's Ann. Laws, § 1359.

Assuming that the exception taken to the instruction was equivalent to a specific request to charge the jury on the law applicable to manslaughter, there was no proof of any circumstances from which the court could say, as a matter of law, that the deceased was maliciously killed. It might reasonably be inferred, from the wounds found on Sink's body, and the fact that he died from the effects thereof within a year, that he was killed by means of deadly weapons; and, if it could be inferred that such weapons were deliberately used, the law would conclusively presume an intent to murder (Hill's Ann. Laws, § 775, subd. 1); but, in the absence of any circumstances tending to show malice, it was the special province of the jury to say by their verdict whether the weapons which caused the death were used deliberately.

5.   The defendant, having been arrested in Portland, was taken before D. McLauchlan, chief of police of that city, who interrogated him respecting certain circumstances which might tend to connect him with the

commission of the crime; and these questions, and the defendant's answers thereto, having been taken in shorthand, were transcribed, and McLauchlan, having examined the transcript thereof before being called as a witness, was permitted, over the defendant's objection and exception, to detail the conversation which occurred in his presence; and in answer to the question, "Aside from the notes of your stenographer, you would not trust to your memory so extensively?" the witness said, "If I did not have the notes, I would trust to my memory." It is insisted that, the memorandum not having been made by the witness, the court erred in permitting him to testify after he had examined it. The statute allows a witness to refresh his memory respecting any fact which has been noted by himself, or another under his direction, at the time when the fact occurred, or immediately thereafter, or at any time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing: Hill's Ann. Laws, § 836; *State* v. *Bartmess*, 33 Or. 110 (54 Pac. 167). In *State* v. *Moran*, 15 Or. 262 (14 Pac. 419), it is held that the evidence given by a witness is not incompetent for the reason that, before going on the witness stand, he refreshed his memory by reading a narrative of the facts written by another; and, under the rule thus announced, no error was committed.

The state having called one Dr. John Stott, a practicing physician, who testified that he made a microscopical examination of some coloring matter found upon a splinter of wood taken from the bottom of the buggy used by defendant and deceased on September 13, 1898, and compared it with specimens of fresh human blood, with the result that they were practically the same, the following question was propounded to him on cross-examination: "Where blood is exposed to the atmosphere

or to moisture, how long would it take for it to become thoroughly dry?" But, the court having sustained an objection on the ground that it was not proper cross-examination, an exception was saved. It is contended that the court erred in not permitting the witness to answer the question. It is impossible for us to say, from the paucity of the record, whether the question propounded was a proper cross-examination of the witness ; but it would appear that the subject upon which he testified was one beyond the ordinary intelligence of an average juror, and this made the witness an expert, and, such being the case, it would seem that he should have been permitted to answer the question propounded to him. But, however this may be, it is probable that this and certain other alleged errors will be avoided upon a second trial. Finding prejudicial error in the record, it follows that the judgment is reversed, and a new trial ordered.    Reversed.