Argued July 12; affirmed July 31, 1934

WEIS *v.* ALLEN

(35 P. (2d) 478)

*Earl F. Bernard* and *John J. Coughlin,* both of Portland (Collier, Collier & Bernard and John Coughlin, all of Portland, on the brief), for appellant.

*Joseph H. Page* and *George A. Hall,* both of Portland, for respondent.

BAILEY, J. The plaintiff, Matt Weis, brings this action to recover damages from his employer, the defendant Allen, for injuries suffered by plaintiff when shot by a spring gun alleged to have been set by the defendant, on the latter's property where plaintiff was employed. From a judgment in favor of plaintiff for general and punitive damages, the defendant prosecutes this appeal.

At the time of the injury to plaintiff, both he and the defendant were subject to the provisions of the Workmen's Compensation Act of this state. The plaintiff applied to the State Industrial Accident Commission and was awarded compensation for his injuries in the full amount to which he was entitled under said act, $2,400.

Section 49-1828, Oregon Code 1930, provides in part as follows:

"If injury or death results to a workman from the deliberate intention of his employer to produce such injury or death, the workman * * * shall have the privilege to take, under this act, and also have cause for, action against the employer, as if this act had not been passed, for damages over the amount payable hereunder."

The defendant challenged the sufficiency of the evidence to support a verdict in favor of plaintiff by interposing motions for involuntary nonsuit, for a directed verdict and for a new trial, on the ground that there was no competent evidence to prove that the injuries sustained by plaintiff resulted "from the deliberate intention of his employer", defendant herein, "to produce such injury". The three principal assignments of error are based on the court's refusal to grant these motions.

■ In determining whether or not the trial court erred in denying the motions it is the duty of this court in considering the motions to resolve in favor of the plaintiff every legitimate inference that can be drawn from the evidence, as such motions admit all that the evidence proves and all that it tends to prove.

The injuries of which plaintiff complains were caused by a mishap which occurred on October 5, 1932. At that time the defendant was the lessee and in possession of two large lots in the city of Portland, on which he was operating an automobile wrecking and junk yard.

Each of the lots contained approximately one quarter of a block. They were located in the same block, one at the corner of Stephens street and Grand avenue, termed yard A, and the other at the corner of Union avenue and Mill street, designated as yard B. The two yards met at the inner corners only, and were there connected by a gate. Each yard was surrounded by a fence six or seven feet high, in which there was a double gate opening on the street. On each lot there was a small shed which served as an office and a storeroom for the more valuable small parts and tools. Outwardly the wrecking lots appeared to be two separate establishments.

At all times to which we refer in this opinion the defendant Allen was the sole proprietor of the business carried on in yard B. He owned and operated the business in yard A jointly with one Thomas Comzny until November 19, 1931, when he purchased his partner's interest.

As early as 1930 the defendant directed his employee Peterson, who was in charge of yard B, to make and set spring guns in that yard, in an attempt to pre-

vent the burglarizing therein which was frequently being committed. The defendant also tried to persuade his partner to permit the setting of spring guns in yard A, but Comzny protested and would not sanction it, advising Allen that the setting of spring guns was unlawful.

Shortly after the defendant became the exclusive owner of both yards and sometime during November, 1931, the plaintiff was employed by Allen and placed in charge of yard A. Soon thereafter Peterson, at the command of Allen, placed in the shed in yard A the spring gun by which plaintiff later was injured. Peterson and the plaintiff were the only employees of defendant, and Peterson remained in charge of yard B until Edwin Lyons replaced him, about a month before the occurrence on which this action is based, with the exception of a short time when Lyons worked with Peterson.

From the time that plaintiff's employment began until Peterson was discharged, the plaintiff in closing for the night would lock the door of the shed in yard A, turn his keys over to Peterson or hang them in the shed in yard B and leave by way of the street gate in yard A, locking that behind him. In the morning, before going on the premises, he would wait outside until Peterson had released all the spring guns and unlocked the doors of the sheds in both yards. He would then receive his keys from Peterson, go around and unlock the street gate of yard A, through which he would then enter.

As long as he remained in Allen's employ, Peterson, in the evening before leaving, would set the spring guns in both yards. At times there were, in addition to the guns in each shed, at least two other spring

guns in yard B, one fastened underneath an automobile and the other concealed in a runway. The exact number of guns set at any time does not appear definitely in the record. At intervals, however, no guns at all would be set, especially on Saturday evenings preceding the Sundays when Weis was to be in charge of the yards.

When Peterson ceased to be employed by the defendant, and Lyons was placed in charge of yard B, the plaintiff continued his accustomed routine in closing up at night and waiting in the morning for Lyons to open the street gate of yard B. No spring guns were set in yard A after Peterson left, until about ten days or two weeks prior to October 5, 1932. At that time Allen came to Weis and told him that the lock on the outer gate of yard A had been broken and it would be necessary to set the spring gun again in the shed in that yard. Allen set the gun himself, demonstrated it to plaintiff and gave him detailed instruction about it. Each evening thereafter at closing time Allen would appear at the office in yard A, obtain from plaintiff the receipts of the day and the keys to the office, and would then supervise the setting of the gun.

The spring gun was fastened underneath a shelf with a fine wire, close to the floor and practically invisible, leading from the trigger of the gun, across the opening of the door and to a nail, where it was attached. This arrangement would cause the gun to be discharged when any one opened the door and entered. In setting the gun the door would first be locked, and by reaching through a hole in the wall the firing-pin could be put in place and the spring set.

On the evening of October 4 the usual procedure was followed. When, however, plaintiff went to turn

over his keys to Allen he discovered that they had been left in his overalls in the office in yard A. At the request of Allen he obtained duplicate keys in yard B, unset the gun, opened the door and got his keys from within the office in yard A, locked the door and turned all the keys over to Allen. He then started to reset the gun in the shed in yard A and was told by Allen not to do so, that the gun would not be set that evening. Weis then quitted the premises, leaving Allen standing at the door of the shed in yard A. Later that evening both Allen and Lyons, who alone were on the premises, departed through the street gate in yard B, locking it behind them. No one except Allen and Lyons had keys to the premises, and after closing for the night neither of them returned until the next morning. Lyons was not in yard A after Weis left.

The next morning, October 5, the plaintiff waited until Lyons had opened the outer gate of yard B and given him his keys. He then went around to the outside gate of yard A, unlocked it and unlocked the door of the office or shed in that yard. As he stepped into the shed to get his overalls the spring gun was discharged, severely injuring him by inflicting innumerable gunshot wounds in both his legs. A customer heard the shot and upon ascertaining what had happened, notified Lyons in the next yard. When the latter appeared he was asked by Weis to call the police and summon an ambulance.

The police and Allen reached the yard at approximately the same time, about five minutes after the plaintiff was shot. Allen approached Weis and "in kind of a whisper" asked him to assume the blame for the discharge of the gun, assuring Weis that he would "make it all right" with him, if he would do

so, and would keep up his wages during such time as plaintiff might be in the hospital, also pay all his hospital and doctors' bills. Plaintiff testified that the defendant also said to him: "The police may want to arrest you for this; there may be a small fine; I will pay the fine, don't worry about that. If they arrest you, I will go your bond."

Some time before this occurrence a watchman in yard B was shot through a leg of his trousers and his dog was injured. This was brought to the attention of defendant. The latter was also told by the police, about May, 1932, to discontinue the use of spring guns, which, according to his testimony, he did for the time being. In the beginning the spring guns were set so as to be discharged without probable injury to any trespasser, with the object of frightening away intruders rather than wounding them. Later the guns were so arranged as to destroy life or inflict serious bodily injury on those who might come within their range.

■■ Section 14-925, Oregon Code 1930, makes it unlawful for any one to place or set a loaded spring gun, designed for containing or firing explosives, in any place whatever where such gun may be fired or discharged by contact of any human or animal with any string, wire or "other contrivance affixed thereto or connected therewith, or with the trigger thereof".

There are many decisions dealing with the liability of the owner or lessee of land upon which he has set spring guns or other such contrivances, but most of such cases concern injury to a trespasser. In *Grant v. Hass,* 31 Tex. Civ. App. 688 (75 S. W. 342), which has frequently been relied upon as an authority, the opinion reviews many of the decisions relating to liability,

both civil and criminal, of one who keeps a spring gun set on his premises. After stating that the owner of private ground is under no obligation to keep it in a safe condition for a mere trespasser and that one who intrudes must take the premises as he finds them, the court observes:

"But when the owner employs upon his premises and sets in motion dangerous agencies, such as spring guns, man-traps, etc., of a nature calculated to cause death or inflict serious bodily injury, with the intention of inflicting injury upon a trespasser, and injury results, he is liable, unless facts and circumstances exist which in law would amount to an excuse or justification."

The opinion then considers the facts in the case and with reference to the defendant's liability states the following conclusion:

"If the defendant had been present and actually fired the gun, in the light of the facts then existing, he would have been guilty of a crime, as the assault would not have been justifiable. When he set the spring gun and undertook by that means to use and put in motion a deadly weapon, the discharge of which he must have known would inflict serious bodily injury, its discharge could only be justified by the conditions existing at that time; and if they were such as would not have excused him if he was present and actually fired the gun, they would not excuse him if fired in his absence. He can not legally indirectly do that which the law directly prohibits.

\*　　\*　　\*　　\*　　\*

"Every man is held to the necessary, natural and probable consequences of his act, the contemplation of which the law presumes, whether or not he does so in fact. The defendant, it is true, placed the gun with the view of firing upon a thief, with the intent and purpose to injure, and with the knowledge that the means employed were of a nature calculated to pro-

duce that result. If the gun was fired at a time and under circumstances for which the law would furnish no excuse or justification, the fact that it was prepared and set for a lawful purpose would furnish no excuse for the consequences that resulted from its unlawful discharge. The setting of the gun is one of the incidents in the chain of causation that produced the effect, but the immediate and proximate cause of the injury was its discharge at a time and under circumstances which made the act unlawful. The original purpose, however innocent, became immediately criminal as soon as the innocent means were employed in an unlawful way. The intent to injure some one was in the contemplation of the defendant when he set out the gun. The fact that in executing this purpose a mistake was made and one of a class was injured that was not within his contemplation, may remove the act from a higher to a lesser degree of criminality, but will not excuse. If one with so little regard for human life sets out a spring gun with the purpose and intent to injure, he must accept the chances of its discharge at the wrong time, and under circumstances that may occasion injury to an innocent trespasser. He can not be heard to say that that was a consequence unforeseen, and therefore it was not the proximate result of his acts."

Mr. Justice Holmes of the supreme court of the United States, in *United Zinc & Chemical Co. v. Britt,* 258 U. S. 268 (66 L. Ed., 615, 42 S. Ct. 299, 36 A. L. R. 28), a case involving the maintenance of a nuisance, made this distinction:

"The liability for spring guns and man-traps arises from the fact that the defendant has not rested on that assumption [that no trespasser would intrude], but, on the contrary, has expected the trespasser, and prepared an injury that is no more justified than if he had held the gun and fired it."

In *Hooker v. Miller,* 37 Iowa 613 (18 Am. Rep. 18), the plaintiff, who entered defendant's vineyard for

the possible purpose of stealing fruit, was injured by the discharge of a spring gun, and brought action against the defendant to recover damages for the injuries he thereby sustained. In submitting the case to the jury the trial court gave an instruction to the effect that defendant had no right to use a spring gun for protection against a mere trespasser without notice to him, and that "the defendant's liability on account of the wound caused by the spring gun is the same as though he had discharged it with his own hands". One of the errors assigned on appeal was the giving of that instruction. But the appellate court held that the instruction was proper and that no error was committed in giving it.

■ In the case at bar there is no direct testimony that the defendant himself set the spring gun which injured plaintiff, yet there are sufficient circumstances in the case to warrant the jury in finding that he did set it. In addition to the evidence already mentioned there is also the testimony of the defendant himself, who at first attempted to put the entire blame on his employees for setting and maintaining the spring gun. On cross-examination, however, he displayed a great deal more acquaintance with the construction and operation of spring guns and the location of those on his premises than he was at first willing to admit.

■ The defendant asserts that there is no evidence of any deliberate intention on his part to inflict the injury suffered by plaintiff. The word "deliberate" is defined by Funk & Wagnall's dictionary as "fully or carefully considering the nature or consequences of an act or measure", "formed after careful consideration", and "entered upon after deliberation and with fixed purpose". The record discloses that the guns

were originally set with the purpose of frightening rather than injuring intruders, but in time, as they proved to have no effect on the repeated commission of burglaries in the yards, they were so arranged that their contents would be discharged into the person of any one who might come in contact with the wires operating them. This change was made at the instance and with the knowledge of the defendant, and the guns, set to inflict serious injury, were so maintained by him even after he had been ordered by the police to discontinue their use as dangerous and unlawful. There can be, therefore, no question but that these guns were kept and used by the defendant with the deliberate intention of injuring any one who might inadvertently cause them to be discharged.

■ It might have been unforeseen by the defendant that this particular employee or any employee or other innocent victim would be the one to be shot. Nevertheless he knew when he set the gun on October 4, after especially telling plaintiff that it would not be set that night, that the plaintiff might be injured on the following morning unless the gun were sooner discharged or unset, or plaintiff warned that it had been set contrary to his expectation. The fact that on October 5 the defendant himself went to the yards at eight o'clock or a few minutes thereafter, rather than at nine o'clock as was his almost invariable custom, could be interpreted as indicating that he was more than a little apprehensive.

It was not necessary here to prove that the defendant had singled the plaintiff out and set the gun with the express purpose of injuring him and no one else. The act which the defendant did was unlawful and was deliberately committed by him with the intention

of inflicting injury. The excerpts hereinbefore quoted from *Grant v. Hass,* supra, have, in our opinion, a special application to the facts in the case at bar and negative this defendant's contention that the record fails to disclose a deliberate intention on his part to injure the plaintiff.

Although the plaintiff was attending to the customary duties of his employment at the time of the mishap, nevertheless the cause of his injury can not be said to be incidental to, or in any way connected with, the carrying on of the business in which the defendant was engaged. The facts in this case differ essentially from those in *Jenkins v. Carman Manufacturing Co.,* 79 Or. 448 (155 P. 703); *Heikkila v. Ewen Transfer Co.,* 135 Or. 631 (297 P. 373); and *Delthony v. Standard Furniture Co.,* 119 Wash. 298 (205 P. 379), cited by counsel for defendant. In all those instances the injury complained of arose out of and in the course of the plaintiff's employment and was due to carelessness or negligence on the part of the employer in the actual conduct of his business.

■ Our investigation discloses that only one other state, Washington, has a statute similar to the section of our code here involved. Many of the states increase the award to the injured workman by a fixed percentage in the event that his injury is caused by the wilful or seriously wilful misconduct of his employer. Decisions on the construction of statutes containing that provision throw but little light on the question before us.

In one such case, *Boek v. Wong Hing,* 180 Minn. 470 (231 N. W. 233, 72 A. L. R. 108), the court, in considering the employer's defense that the only remedy which the employee had for injuries intentionally and maliciously inflicted upon him by his employer was by

way of an allowance under the Workmen's Compensation Act, observed:

"An employer who intentionally and maliciously inflicts bodily injuries on his servant should occupy no better position than would a third party not under a compensation act, and should not be heard to say, when sued at law for damages, either that the injury was accidental or that it arose out of the employment. By committing a felonious assault upon a servant the master wilfully severs the relation of master and servant and should be held to have left it to the election of the servant either to consider the relation still existing and seek redress through the compensation act, or else to consider the relation terminated and seek redress under the common law."

In Oregon, however, an employer subject to the Workmen's Compensation Act is given more consideration than in most other states, in that the amount of damages which can be recovered against him is reduced by the amount which the injured workman is entitled to receive under the act. Were it not for the special provision of our code, the employee probably would have to elect whether to pursue his remedy under the Workmen's Compensation Act or sue at common law. Instead of compelling the injured workman to elect at his peril which course to pursue, § 49-1828, Oregon Code 1930, assures him at least the compensation which he would be entitled to receive in any event for the injuries suffered, and in addition grants him the right to avail himself of his common-law remedy.

The plaintiff in his initial plea did not refer to the fact that he was protected by the Workmen's Compensation Act and had been awarded the sum of $2,400 by the State Industrial Accident Commission. These facts were set forth in the defendant's answer. In

his reply the plaintiff admitted them, and changed his prayer by reducing proportionately the amount sought to be recovered from defendant.

■ One of the defendant's assignments of error on this appeal questions the right of plaintiff to recover punitive damages, on the ground that any recovery at all from the employer as general or compensatory damages, over and above the amount allowed by the Workmen's Compensation Act, is in the nature of punitive damages. The wording of the statute, however, is that if the injury results from deliberate intention of the employer, the employee shall have cause of action against his employer, "as if this act had not been passed", for the recovery of damages in a sum over and above that to which he is entitled as an award under the act. The defendant does not dispute that at common law it would have been proper to submit to the jury the question of punitive damages, in the light of the facts in this case. The section of the act in question does not limit the amount of recovery on the part of the injured employee, but creates an additional fund for the payment of a part of the damages for injuries sustained.

■ The trial court instructed the jury as follows:

"The law of Oregon provides that it shall be unlawful for any person to place or set any loaded spring gun or set-gun, or any gun or firearms, or other device of any kind designed for containing or firing explosives, in any place whatsoever where the same may be fired, exploded or discharged by the contact of any person or animal with any string, wire, rod, stick, spring, or other contrivance affixed thereto or connected therewith or with the trigger thereof."

The giving of this instruction is the basis of one of the appellant's assignments of error and with ref-

erence thereto it is contended that the instruction is
"upon an abstract question of law, not relevant to
the issues of the case". The fact that the defendant
was, with knowledge and in defiance, of the law, main-
taining spring guns, shows wantonness on his part,
and the instruction regarding spring guns was cer-
tainly relevant on the question of punitive damages. It
is not necessary for us to go further and here decide
whether or not it would be relevant as to compensatory
damages.

■ The two remaining assignments of error relate
to the court's charge concerning disputable presump-
tions, wherein the court, after stating that a presump-
tion is a deduction which the law expressly directs to
be made from particular facts, and that a disputable
presumption might be overcome by other evidence,
instructed the jury that the law declares to be dis-
putable presumptions, (1) "that an unlawful act was
done with unlawful intent", and (2) "that a person
intends the ordinary consequences of his act". It is
asserted by the appellant that since no one testified
to seeing him set the spring gun, then the only means
by which the jury could find that he actually did so
was by inference, and that the instruction above re-
ferred to allowed the jury to base a presumption on an
inference. The only objection noted to the giving of
this instruction was that "the law in this case specif-
ically provides that he [the defendant] must have in-
tended to injure the employe". The particular ques-
tion now being raised was not presented to the trial
court.

The Oregon case on which appellant principally
relies in this connection is *State v. Magers*, 35 Or. 520
(57 P. 197). Part of the decision therein, quoted by ap-

pellant, is to the effect that, where there was no eyewitness to the killing and no evidence tending to show the manner of killing, it was erroneous to instruct the jury that it might "return a verdict of guilty of murder in the first or second degree only". The court, however, further in its opinion said:

"It might reasonably be inferred, from the wounds found on Sink's body, and the fact that he died from the effect thereof within a year, that he was killed by means of deadly weapons; and, if it could be inferred that such weapons were deliberately used, the law would conclusively presume an intent to murder."

In the case before us we find that the circuit court committed no error. The judgment appealed from is therefore affirmed.

RAND, C. J., and BEAN and CAMPBELL, JJ., concur.