## BEN GILBERT v. STATE.

No. A-1216.   Opinion Filed November 18, 1912.

(127 Pac. 889.)

1.  **JURY** — Challenges — Grounds. Where the state relies in part upon the testimony of an accomplice, and a juror on examination testifies that his mind is in such a condition that he would disregard the testimony of an accomplice regardless of the manner in which it might be corroborated, it is not error for the trial court to sustain a challenge 'for cause made by the state to such juror.

2.  **WITNESSES**—Corroboration—Evidence of Character. (a) Where upon a trial a material conflict arises in the testimony of two or more witnesses, of such a character as to raise a question of veracity between them, either side has the right to sustain its witness by proof of general good character for veracity.

    (b) Where the veracity of a witness is in any manner called in question, it may be sustained by proof of his general reputation for truthfulness.

3.  **TRIAL**—Reception of Evidence—Reopening Case—Discretion of Court. The matter of reopening the testimony and allowing a witness to be placed upon the stand after the evidence has been closed by both sides is within the discretion of the trial court, and will not be reviewed upon appeal except upon a clear showing of abuse of this discretion.

4.  **TRIAL** — Instructions — Credibility of Witnesses. It is reversible error in a close case for the trial court to instruct the jury as follows: ''In this connection, gentlemen of the jury, you are instructed that, if you believe from the evidence that any witness has knowingly and willfully testified falsely as to any material fact in the case, you have a right to disregard any and all testimony of such witness except in so far as the same may be corroborated by other credible evidence or by the facts and circumstances proven in the case''—because this instruction is calculated to create the impression upon the minds of the jury that they are bound to believe the testimony of such witness if they find he has been corroborated.

(Syllabus by the Court.)

*Appeal from District Court, Caddo County;*
*Frank M. Bailey, Judge.*

Ben Gilbert was convicted of grand larceny, and appeals. Reversed and remanded for new trial.

Appellant was convicted in the district court of Caddo county for the offense of grand larceny, and his punishment was assessed by the jury at confinement in the penitentiary for the period of one year and six months.

Oliver Young testified for the state that he resided about two and a half miles from Gracemont and resided there in 1909; that on the 20th day of December of that year witness went to Lincoln county, Okla.; he left some hogs in a pen; his hogs were left in charge of Mr. Ballinger; witness reached home on the 27th day of December; two of his hogs were gone; witness had not given any one permission to take them away; the hogs that were gone weighed about 250 pounds each and were worth about $7.80 per hundred pounds; witness went to the house of Lewis Brooks in the town of Gracemont and made a search of his premises for meat; in the northeast corner of the yard witness found a set of intestines, liver, and heart about 20 or 30 feet from Brooks' house.

W. H. Ballinger testified that in 1909 he lived three miles south of Gracemont in Caddo county, and was acquainted with Oliver Young; that in the latter part of December Young left his home to visit some relatives; that when Young left home he placed witness in charge of his premises and hogs; that Young lived about half a mile from witness; that on the evening of December 26th witness fed Young's hogs in the pen near the railroad track; no hogs were missing at that time; on the morning of the 27th day of December witness missed two hogs from the pen; that they weighed about 250 pounds each; witness had not given any one permission to take these hogs away; witness trailed the hogs from drops of blood on the railroad track and cross-ties; the hogs were placed on a hand car and carried on the railroad about half a mile to a wagon road crossing, where they were transferred from the hand car to a wagon; witness found a hand car on the railroad near there which had blood on it where the hogs

had lain and bled; witness then took the wagon track at the crossing of the railroad and followed it to the town of Gracemont; the wagon drove into an alley back of the house of Lewis Brooks; a deputy sheriff and other parties were with witness; the parties found fresh hog manure and corn stalks with fresh blood on them where the wagon had been unloaded; witness then went down to get a search warrant and got back to Lewis Brooks' house about 9 o'clock; tracks led from the wagon where the hogs had been taken to the house of Lewis Brooks; witness and officers searched the house of Lewis Brooks; in the north room of the house the parties found leaf lard and a liver and a heart from a hog in a bread pan; witness examined this; the top was cold but the under sides were still warm; witness saw Lewis Brooks in the house when they first got there; witness also saw appellant, Ben Gilbert, there at the time, but had no conversation with him; witness heard appellant, Ben Gilbert, say to Lewis Brooks that he would go down town; if he was needed for anything he would be down there; this occurred in Caddo county, Okla.

C. S. Hirschler testified that he remembered the circumstances of Oliver Young losing a couple of hogs in December, 1909; that witness is one of the parties who went to search the house of Lewis Brooks; they found a bloody axe in Lewis Brooks' house; witness was also present when entrails of the hogs were found buried in the yard of Lewis Brooks.

Joe A. Baker testified for the state that in 1909 he was deputy sheriff of Caddo county, Okla.; he heard of the hogs being stolen from the witness Young; witness went to Lewis Brooks' house and told him he had a warrant to search the place; witness replied, "Go ahead and search, I am busy with my chores;" witness saw Ben Gilbert at the house of Lewis Brooks that morning; witness found a pan on a shelf in the east corner of the house with some fresh lard and fat meat from the inside of a hog; it looked fresh; they also found a liver; the under side of the lard was still warm, and under the flaps of the liver it was still warm; there was a bed in the room where the meat was found, and a cook table was there also; witness did not see any blood spots on the floor that morning, but there was some blood on the table where the meat

was found in the pan; witness saw appellant Ben Gilbert at Lewis Brooks' house that morning, but did not notice any blood·on his clothes; witness knows that appellant Ben Gilbert then had on his Sunday clothes.

E. G. Darnol testified for the state that he remembered the occasion of Oliver Young losing hogs in December, 1909.; two or three days after this occasion witness saw Ben Hickman and Ben Gilbert in Gracemont; Hickman said to witness that Young was a poor man and that if the boys were penitentiaried he would not get his money back; he called the names of Ben Gilbert and Lewis Brooks; Hickman said $30 was really more than the hogs were worth; "he said he thought I could compromise the case and that Young could get $30 for his hogs; appellant, Gilbert, spoke up and asked if I thought I could conpromise for $50, and I replied that I did not know;" appellant was present during the time Ben Hickman was talking to witness; Hickman said he did not know who stole the hogs, and to penitentiary the boys would not get the money for Young; that Young was a poor man and needed his money.

Lewis Brooks testified that he remembered the occasion when Young lost his hogs in December, 1909; that witness was a party to this theft and was convicted and sent to the penitentiary for this offense; that on the evening before the hogs were killed appellant was at the house of witness; he came about 6 o'clock; he stayed there all night; Sam Cantrell, a cousin of witness, was also there that night; the parties all played pitch together that night until 10 or 11 o'clock; they then hitched up a team to a wagon and went down to Oliver Young's house and got a hand car and got the hogs out of Young's pen; the hogs were placed on the hand car and on it taken to the section line where the hogs were transferred to the wagon and carried to the home of witness; the hogs were killed with an axe, then carried into the house and skinned and divided in half; Ben Gilbert and Sam Cantrell helped witness do this; the hogs were skinned on bagging and an old comfort with fodder under it; after the hogs were cleaned they were put into the crib of witness; they were covered up with corn, cotton seed, and shucks; the entrails were dumped into a corner of

the lot; appellant and Sam Cantrell slept in the north room that night; the north room was about 12 feet square; witness was arrested next day; several days afterwards he saw appellant and told him he might as well plead guilty; that appellant told him that if he and Cantrell would help him he could beat the case. On cross-examination witness testified that he was a witness in his own behalf when his case was tried and he was convicted; he testified that appellant, Ben Gilbert, and Sam Cantrell stayed at the house of witness the night the hogs were stolen; that if they had anything to do with stealing the hogs he did not know it; witness also testified that he (witness) did not have anything to do with stealing the hogs on said trial; that he was swearing then to keep out of the penitentiary; that after witness was convicted and placed in the penitentiary he had some conversation with parties living at Gracemont and was visited in the penitentiary at Mc-Alester; witness was then sick in the hospital; witness was asked if he had rather be out or in the penitentiary, and he was told it was possible for him to get a parole; witness then signed a sworn statement that appellant, Ben Gilbert, and Sam Cantrell stole the hogs; witness was swearing at that time for the purpose of getting out of the penitentiary; after witness swore to the affidavit he was handed a parole; the condition of the parole was that he was to appear and swear against Sam Cantrell and Ben Gilbert for stealing these hogs; witness believes that if he does not stick to the affidavit he made in the penitentiary he will be sent back to the penitentiary again, and that he is swearing now to keep out of the penitentiary. Sam Wood lives a mile and a half from the town of Gracemont; witness was at Sam Wood's house the day before the hogs were stolen; when he came back he brought with him some fresh hog meat and entrails of a hog; he brought these back in a sack; he was on horseback; he started home about dark; witness helped to kill the hogs at Sam Wood's house that Sunday.

Counsel for appellant offered in evidence a motion for a continuance made by Lewis Brooks when his case was called for trial. In this application for a continuance witness Lewis Brooks swore that said appellant, Gilbert, would testify that he was at the home of defendant on December 26, 1909, and stayed there that night;

defendant could not have left said house that night without the knowledge of witness; and that defendant did not leave said house said night and was not gone from said house during the whole of said night. The state then rested its case.

There was considerable testimony offered on the part of appellant placing in issue the facts testified to by the witness for the state, but it is not necessary to state this evidence, because all conflicts in the evidence are settled with the verdict of the jury. We deem it proper, however, to say that appellant, Gilbert, testified that the reason why he stayed at the house of Lewis Brooks on the night in question was because he had been buggy driving with some girls on the previous afternoon; that he had taken them from Gracemont to a place called Nelson; that after they got back to Gracemont one of the bridle bits of the team broke, and the team started to run and broke the tongue out of the buggy; that this made it necessary for witness to remain in Gracemont that night; that as he was putting his team up in the barn Lewis Brooks saw him, and, learning what had happened, requested appellant to stay at his house.

Appellant testified that he played cards until 10 or 11 o'clock that night, when he went to bed and went to sleep and did not wake up until next morning when Mrs. Brooks called him to breakfast, and that appellant had nothing to do with stealing the hogs and knew nothing about it until the next morning when the parties came to search Brooks' house; that appellant had on his best clothes because he had been buggy riding with girls the previous Sunday evening. Witness testified that after Brooks was arrested Brooks sent to get appellant to testify in his favor at the trial, but that appellant refused to do so and left the state and remained away until after Brooks was convicted; that he did this to keep from being a witness against Brooks.

*W. W. Vaughn* and *Lydick & Eggerman*, for appellant.

*Charles West,* Atty. Gen., for the State.

FURMAN, P. J. (after stating the facts as above). First. Appellant complains of the action of the court in sustaining a challenge for cause to the juror Steve Hardesty. It

appears that one of the witnesses for the prosecution was an alleged accomplice of appellant in the commission of the crime charged. The state's attorney was endeavoring to find out as to whether this fact would influence the jury in finding a verdict of guilty, even although the testimony of the accomplice might be corroborated by other evidence. The record on this subject in part is as follows:

"Q. Are you opposed to the state using a witness who has himself been convicted of the same crime? A. I cannot say. Q. Have you any feeling against a party turning state's evidence? A. No, sir. Q. And although a man has been convicted he has a right to come into court and tell the truth and implicate the parties guilty in the transaction? A. I don't know as to that. Q. And then you are prejudiced against a man who has gone and done something of telling on those who were implicated with him in the crime? A. Yes, sir. Q. Rather than do that you believe the guilty parties should go unpunished? A. Yes, sir. Mr. Morris: We challenge the juror for cause. Examination of the juror Hardesty by the Court: Q. Mr. Hardesty, if it should develop that witness in the case has been tried for the same offense and had been convicted, and that later he implicated others in the commission of the crime with him, do you state that your feelings are such that you could not fairly weigh such witness' testimony, giving it such weight and credit as you deem it entitled to receive? A. No, sir. Q. You think your mind is in such condition that you would disregard the testimony of such a witness regardless of the other circumstances in the case or the evidence of the other witnesses? A. Yes, sir. By the Court: The challenge will be sustained; you may stand aside Mr. Hardesty. Mr. Vaughn: To which the defendant excepts."

There was no error in the ruling of the court. Under the law an accomplice is a competent witness for the prosecution, and if his evidence is corroborated by other testimony tending to connect the defendant with the crime committed, it will sustain a verdict. If a juror is in such a frame of mind that on general principles he will not consider the testimony of an accomplice, it matters not how corroborated, such person could hardly be said to be a fair juror for the state, and the state has as much right to have a fair jury as a defendant has.

Second. Upon the trial of this case there was a square and material conflict between the testimony of Gene Darnol, a witness

for the state, and Ben Hickman, a witness for the defendant, of such a character as to raise a question of veracity between them. In rebuttal the state was permitted to prove by a number of witnesses that the general reputation of Ben Hickman in the community in which he resided for truth and veracity was bad, and the state went further and introduced evidence that the general reputation of Gene Darnol in the community in which he resided for truth and veracity was good. To this appellant objected and excepted, and has assigned the introduction of this evidence as error. Even if the ruling of the court was erroneous, it would not be ground for reversal, because we cannot see how any injustice was done appellant or how he suffered any injury thereby. We know that there is a conflict in the authorities upon this subject, but we think that reason and justice sustain the ruling of the trial court. In ancient days jurors were taken from the immediate vicinity in which the crime was committed and they were generally the witnesses in the case, but under our modern system all persons who have any knowledge of the facts of the case are excluded from the jury. The less they know about the facts in a case and the defendant, the better they are supposed to be qualified to decide his fate. The theory of the law is to remove the jury as far as possible from personal feelings or views with reference to the matter in controversy, and to require that they be impartial and receive their first impressions of the case from legal evidence alone given in open court where both parties will be present and have equal opportunity to be heard. This theory is all right, but to carry it into effect there should be some means of informing the jury as to what the witnesses really are who appear before them in a case when a question of veracity is raised between them, so that the jury may know what credit should be attached to the testimony of each witness. Where such a conflict arises in the testimony of witnesses, the jury cannot intelligently decide the issue presented without some information as to the credibility of each respective witness. In this case the credibility of the witnesses Gene Darnol and Ben Hickman was put in issue before the jury by the conflict between them. To permit the credit of witnesses to be put in issue, and then to deny

to either side the right of sustaining its witnesses by proof of general character of veracity, would be to deprive the jury of evidence necessary to the determination of the issue thus submitted to them. For these reasons, even though no court had ever so determined, we would hold that the ruling of the trial court in this case was correct. But we are not without authority sustaining the view which we have taken.

In the case of *Davis v. State*, 38 Md. 18, the Supreme Court of that state held as follows:

"That as the purpose of the state was to discredit the witness H. by disproving material facts testified to by him, it was competent for the prisoner to sustain the witness by proof of his general character for veracity; and, as the credit of the witnesses H. and S. was fairly put in issue, it was equally competent for the state under such circumstances to support the general character of its witness S. for veracity."

The Supreme Court of Virginia in the case of *George v. Pilcher*, 69 Va. 299, 26 Am. Rep. 350, said:

"Whenever the truthfulness of a witness is assailed · either directly or by cross-examination, or by evidence of inconsistent acts or statements, or by contrary evidence as to the matters testified to by him, his reputation for truth may be sustained by direct evidence adduced for that purpose. * * * In answer to the evidence of contradictory statements, and for the purpose of corroborating the testimony of the witness whose veracity has been thus impeached, it seems reasonable to be allowed to show that he is a man of the strictest integrity and of scrupulous regard to truth. 1 Phillips on Ev. 306, 307. See 1 Greenl. on Ev. sec. 468, and notes (Redfield's edition)."

In a case in Aalabama, where evidence was adduced to contradict a witness on an immaterial point, the party who called him was allowed to introduce witnesses to sustain his general character, although the opposite party disclaimed any intention of discrediting him. *Newton v. Jackson*, 23 Ala. 335.

And in North Carolina, in a case decided in 1869 by the Supreme Court of that state, it was held competent to sustain a witness by evidence of character, where it was sought to impeach him by the very question put to him. *State v. Cherry*, 63 N. C. 493.

Where the veracity of a witness is in any manner called in question it may be sustained by proof of his general reputation.

As we are entirely satisfied that reason and justice sustain the view which we take of this question, we will not waste time by citing further authorities in support of our position.

Third.   Upon the trial of this cause, after all of the evidence had been introduced by the state and by appellant, and both sides had announced that the testimony was ended, the court took a recess in the afternoon until 7:30 o'clock that evening.   When the court reconvened in the evening, the record shows that the following proceedings were had:

"The parties all being present as heretofore, the defendant being present in person and by his attorneys, and the jurors all answering 'present' when called by the clerk, whereupon the following proceedings were had in said court, to wit:   Mr. Vaughn: We wish to recall Ben Gilbert to prove one thing by him.   In the hurry to close the case before supper I overlooked one question that I wanted to ask the defendant, Ben Gilbert.   By the Court: What is that?   Dictate it to the stenographer in the absence of the jury (which is done as follows):   Mr. Vaughn:   We wish to place the defendant, Ben Gilbert, on the stand and prove by him that, immediately upon getting out of bed on Monday morning following the night the hogs are alleged to have been stolen, he and Sam Cantrell immediately got up and went to the barn and remained there four or five minutes and then returned to the house.   Which evidence the defendant alleges is true and that the same should be placed before the jury to show that there was ample opportunity for Brooks and his wife to have placed everything in the room in which they slept that they might so have desired.   By the Court:   Which request will be denied.   Mr. Vaughn:   To which the defendant, Ben Gilbert, excepts."

After a case has been closed by both parties, the right to introduce additional testimony is subject to the discretion of the court, and the ruling of the court thereon will not constitute ground for reversal unless it appears from the record that appellant was injured thereby.   In his brief counsel for appellant does not show wherein the court abused its discretion in this respect, neither does he show how appellant was injured by the action of the court.

Fourth.   Upon the trial of this case, among other things, the court instructed the jury as follows:

"In this connection, gentlemen of the jury, you are instructed that, if you believe from the evidence that any witness has knowingly and willfully testified falsely as to any material fact in the case, you have a right to disregard any and all testimony of such witness except in so far as the same may be corroborated by other credible evidence or by the facts and circumstances proven in the case."

To this instruction an exception was reserved. We think that the latter portion of this instruction should not be given, because it is calculated to create the impression upon the minds of the jury that they are bound to believe the testimony of a witness if they find it is corroborated by other credible evidence, or by the facts and circumstances proven in the case. As we understand the law, a jury is not bound to believe the testimony or any part of the testimony of any witness which they think is untrue, and we think that the latter portion of the instruction given trenches upon the province of the jury. See *Henry v. State,* 6 Okla. Cr. 430, 119 Pac. 278. Several cases have been reversed where this instruction has been given, but we have never held that this instruction necessarily constitutes reversible error. In each case reversed on account of this instruction, the evidence was such that the jury would have been justified in reaching a different verdict had it not been for this instruction. This is the condition of the record before us. There is no evidence directly tending to prove that appellant is guilty save that of Lewis Brooks. It is true appellant did leave the state after the commission of the offense, but he voluntarily returned after Lewis Brooks was tried and convicted. His explanation for leaving the state was that he went away because he had refused to testify in behalf of Brooks; and, as Brooks had stated that he was guilty, appellant was afraid he might be used as a witness against Brooks. This explanation appears to be reasonable upon its face. If appellant had assisted Brooks to steal the hogs, it would have been reasonable for him to remain and testify in behalf of Brooks upon his trial and, by assisting in securing the acquittal of Brooks, thereby protect himself. The fact that appellant went away indicates knowledge on his part of the guilt of Brooks. In fact, he admits that Brooks had confessed his

guilt to him and had endeavored to get appellant to testify that he knew that Brooks had not left the house on the night of the theft. Men who steal do not hesitate to swear falsely to protect themselves, but a truthful man may sometimes step aside to keep from testifying against a friend. It may be said that appellant was in the home of Brooks on the night of the theft. This is true, and it should be a lasting lesson to appellant as to whom he associates with.

But it appears there was a girl in the case and that this was the attraction which called appellant to Gracemont on the night of the theft, and that breaking the buggy tongue, whether intentional or unintentional, made it necessary for him to remain there that night. If the facts testified to by appellant with reference to breaking the buggy tongue were not true, the state could and should have disproven them, but they stand uncontradicted in the record. One of the witnesses who searched the home of Brooks on the morning after the theft saw fresh blood on Brooks, but no one saw blood on appellant, and the sheriff testified that appellant had on his Sunday clothes. This is a significant fact and corroborates appellant as to his business at Gracemont on that interesting occasion. We are told by the poet: "In the spring the young man's fancy lightly turns to thoughts of love." If appellant had restrained himself and waited until the regular spring season opened, the chances are that he would not have been caught in the meshes of the law. This looks very much like the case of old dog Tray who was caught and severely beaten for being in bad company.

Appellant assisted Hickman in attempting to compromise the case, but this did not prove him guilty of stealing the hogs any more than it made Hickman guilty of the same crime. This evidence was all reasonably explained and left nothing against appellant except the testimony of Lewis Brooks. Lewis Brooks, according to this record, is a self-confessed thief and self-confessed perjurer. A person who has been convicted of perjury is incompetent to testify as a witness. While Brooks has not been convicted of perjury by a jury, yet he unblushingly and brazenly admits his guilt of this offense. Not having been convicted by a

jury, his evidence is not rendered inadmissible, but in a court of reason and justice it should receive but little credence and weight. The testimony could not come from a more thoroughly corrupt and infamous source, and we believe that, without the instruction complained of, the jury would not have considered it for one moment. But as Brooks was corroborated in some of his statements, this instruction was calculated to make the jury believe that they were bound to accept this evidence. This is not the law. A jury may reject any or all testimony which they do not believe to be true. There is no law which compels them to accept any testimony which they believe to be false. This is the vice in the instruction complained of.

We are therefore of the opinion that in this case the giving of this instruction was reversible error.

The judgment of the lower court is therefore reversed and the cause remanded for a new trial.

DOYLE, J., concurs; ARMSTRONG, J., absent, and not participating.