Argued September 7, reversed September 21, 1915.

## STATE v. LOUIE HING.

### (151 Pac. 706.)

**Criminal Law—Evidence—Admissibility—Uncertified Paper.**

1. In a prosecution for murder, an uncertified paper, being the deputy county clerk's memorandum, purporting to show that defendant, when arraigned, stated his true name to be another than that under which he was indicted, was incompetent, where there was a journal entry showing the arraignment, which might be proved under Section 752, L. O. L., providing that judicial records may be proved by the production of the original, or a copy thereof, certified by the clerk having custody thereof.

**Witnesses—Impeachment—Character.**

2. Evidence of the good reputation of a witness for the state for truth was inadmissible where the reputation of such witness had not been impeached, except by contradiction of his testimony; Section 865, L. O. L., providing that the good character of a witness is not admissible until the character of such witness has been impeached.

[As to impeaching witnesses, see note in 14 Am. St. Rep. 157.]

**Criminal Law—Appeal and Error—Review—Evidence.**

3. In a murder case, an assignment of error that there was no evidence to warrant an instruction on manslaughter will not be examined, where it does not appear that the bill of exceptions contained all of the evidence.

From Multnomah: GEORGE N. DAVIS, Judge.

Department 1.    Statement by MR. JUSTICE HARRIS.

Louie Hing was indicted for murder in the second degree on account of the killing of Lum Fong. A trial resulted in a verdict finding the defendant guilty of manslaughter. It is related in the bill of exceptions that three Chinese witnesses, Seid Jan, Ju Foo and Chin Sing, in support of the indictment, testified that on the night of March 16, 1913, the defendant, accompanied by another Chinese, entered a store conducted by the deceased at 81 Second Street, in Portland; that, Louie Hing having asked Lum Fong for 5 cents worth of olives, the latter delivered the olives to the defendant, who then paid Lum Fong; and that the defendant shot Lum Fong when the latter was about to deposit the money in the cash register. The state also called a detective and captain of police, each of whom testified that diligent search had been made for the defendant until the time of his arrest. E. J. Kennedy, the assistant county jailer, declared that the defendant gave Gun Shing as his name, and refused to answer to the name of Louie Hing while in jail. P. Maloney and Tom Swennes, city detectives, deposed that the defendant gave Gun Shing as his true name when he was arrested. The court also received in evidence a paper, taken from the office of the clerk, purporting to show that the defendant, when arraigned, answered that his true name was Gung Shing. The defense called two Chinese witnesses, Lee Yin and Lee Jock, who testified that on the night of March 16, 1913, at the time of the killing, Louie Hing was in The Dalles, Oregon, where he had been for four or five days prior to that time. Lee Gin, a witness for the defendant, testified that at the time of the homicide Seid Jan was dealing fan-tan in a gambling-room which was separated from

the place where Lum Fong was shot, and that Seid
Jan could not have witnessed the killing.  The defend-
ant also introduced evidence which tended to show that
at the time of the homicide a tong war was being waged
in Portland between the Bow Leong Tong and the Hop
Sing Tong, and that the deceased and some of the
witnesses for the state belonged to the Bow Leong
Tong, while the defendant and Lee Yin were members
of the Hop Sing Tong.  In rebuttal the state offered
evidence tending to show that the general reputation
of Seid Jan for truth and veracity was good.  The
bill of exceptions declares that there was evidence as
already related, but does not affirm that there was no
additional evidence.  The defendant appealed from the
judgment pronounced upon the verdict.

REVERSED AND REMANDED.

For appellant there was a brief over the names of
*Mr. Leon Yanckwich, Mr. Daniel E. Powers* and
*Messrs. Fulton & Bowerman,* with oral arguments by
*Mr. Yanckwich* and *Mr. Jay Bowerman.*

For the state there was a brief over the names of
*Mr. John A. Collier,* Deputy District Attorney, *Mr.
Walter H. Evans,* District Attorney, and *Mr. Joseph
L. Hammersly,* Deputy District Attorney, with an oral
argument by *Mr. Collier.*

MR. JUSTICE HARRIS delivered the opinion of the
court.

1. The defendant excepted to the introduction of an
uncertified paper which purports to show that, when
arraigned, he stated his true name to be Gung Shing.
E. P. Mahaffie, after stating that he was deputy county
clerk, and as such had charge of the Circuit Court

work, including the criminal business, testified that the paper was made up in the office of the county clerk and constitutes the clerk's memorandum, which is entered in the journal; that it had been the custom of the deputy clerk in the criminal department to make notes of what was done in a case, and afterward to deliver the notes to the witness, who then drew the clerk's memorandum, which was not only used for making an entry in the journal of the court, but was also filed and became a part of the permanent record of the case. Mr. Mahaffie further testified that he had no recollection of being present at the time the defendant was caused to plead, but that the information contained in the paper was either received from the office of the district attorney or had been brought to him by another deputy clerk. The paper was not competent. The defendant was indicted under the name of Louie Hing. It is explicitly commanded by Section 1466, L. O. L., that:

"If the defendant allege that another name is his true name, the court must direct the entry thereof to be made in its journal, and the subsequent proceedings on the indictment may be had against him by that name, referring also to the name by which he is indicted."

The journal of the court, therefore, is made the judicial record and final memorial of what occurs upon the arraignment of an accused person who alleges that another name is his true name. A judicial record of this state, by the terms of Section 752, L. O. L., "may be proved by the production of the original, or by a copy thereof, certified by the clerk or other person having the legal custody thereof, with the seal of the court affixed thereto, if there be a seal." If the journal contained no entry showing the arraignment, then quite a

different question would be presented; but, in the absence of evidence to the contrary, it will be presumed that official duty was performed, and that the journal does in fact contain a record of the arraignment; and, furthermore, the evidence tends to show that an entry was actually made in the journal. An entry having been made in the book specified by Section 1466, L. O. L., it necessarily follows that the journal is the original judicial record of the name given by the defendant when arraigned. The paper complained of was not competent evidence, because it was neither the original judicial record nor a certified copy of the original, but was only a writing which was used for the convenience of the clerk. Undoubtedly, the paper, which pretended to recite what the defendant said when formally accused in open court with the crime of murder, carried more weight with the jury than the oral testimony of witnesses, because the writing had the semblance of an indisputable court record, while the oral statements of the jailer and detectives rested only upon human memory. The state was entitled to show by any available competent evidence that the defendant assumed a name different from his true name. The prosecution could have offered the journal of the court, or a certified copy; but the reception of the paper objected to was, on the record as written in the bill of exceptions, prejudicial to the substantial rights of the defendant.

2. The next assignment of error involves the testimony of W. E. Gray, a clerk in the employ of the Merchants' National Bank, and of J. G. Burness, a teller in Ladd & Tilton's Bank. After telling the jury how long Seid Jan had transacted business with the banks mentioned, these two witnesses were permitted

to testify, over the objection of defendant, that the general reputation of Seid Jan for truth and veracity was good. It will be remembered that Seid Jan swore that he saw Louie Hing shoot Lum Fong. The defendant did not offer any evidence concerning the reputation of Seid Jan for truth and veracity. The state contends that the evidence of Lee Gin, who testified that Seid Jan was dealing fan-tan in a gambling-room and could not have witnessed the homicide, constitutes an assault upon the character of Seid Jan which authorized the evidence objected to. It is provided in Section 865, L. O. L., that evidence of the good character of a witness is not admissible in any action, suit or proceeding, "until the character of such witness has been impeached"; and this statutory provision is only declaratory of the common-law rule which prevailed prior to its enactment: *National Bank* v. *Assurance Co.,* 33 Or. 43 (52 Pac. 1052). In the case of *Glaze* v. *Whitley,* 5 Or. 165, it was ruled that evidence of good character is admissible whenever a witness has been impeached in any of the ways provided for in Sections 863 and 864, L. O. L.; but that case was overruled by the decision in *Sheppard* v. *Yocum,* 10 Or. 402. To warrant evidence of the good character of a witness, there must have been evidence tending to impeach the character of that witness, and evidence of contradictory statements will not suffice: *Sheppard* v. *Yocum, supra; Osmun* v. *Winters,* 25 Or. 260 (35 Pac. 250); *National Bank* v. *Assurance Co., supra.* The testimony of Lee Gin directly contradicts Seid Jan; and, while the stories told by the two witnesses cannot both be true, still it is simply a case of one witness contradicting another. To permit the introduction of evidence of good character every time a witness is

contradicted by an opposing witness would cause delay
and multiply the issues in almost every controversy
presented in court.    The rule adhered to in most jur-
isdictions, and the one sustained by the logic of prior
adjudications in this state, makes evidence of the wit-
nesses Gray and Burness inadmissible: 3 Ency. of
Ev. 18; *State* v. *Nelson,* 13 Wash. 523 (43 Pac. 637).
In the note to the well-considered case of *First Na-
tional Bank* v. *Blakeman,* 19 Okl. 106 (91 Pac. 868), as
reported in 12 L. R. A. (N. S.) 364, the editor states:

"The authorities are nearly unanimous in holding
that the mere fact that a witness' testimony is contra-
dicted by opposing testimony does not warrant the in-
troduction of evidence as to his reputation for truth
and veracity."

It is true that in the final charge to the jury the
court told the triers of the facts to disregard all the
testimony of the witnesses touching the general reputa-
tion of Seid Jan for truth and veracity.    Three Chinese
testified for the state, and the same number of Chinese
appeared as witnesses for the defendant.    If the jury
believed the three for the state, it was because they did
not believe the Chinese who testified for the defendant.
The element of honest mistake could not have entered
into the testimony of any one of the six Chinese wit-
nesses.    Each set of three Chinese either told the truth
or deliberately falsified, and in that state of the record
the admission of the incompetent writing constituted
more than a mere technical error, because it may have
had much weight with the jury in determining which
group of Chinese testified to the truth.    It is likewise
doubtful whether the language employed by the court in
withdrawing the evidence of the witnesses Gray and
Burness from the consideration of the jury was suf-

ficiently emphatic to accomplish the purpose intended or enough to unring the bell. The language of Mr. Chief Justice McBRIDE in *State* v. *Rader,* 62 Or. 37 (124 Pac. 195), is peculiarly appropriate to the instant case:

"While in some cases an express instruction to the jury to disregard testimony injuriously admitted is properly held to cure the error, yet the courts are cautious in the application of this rule. It is not an easy task to unring a bell, nor to remove from the mind an impression once firmly printed there, and the withdrawal of the testimony should be so emphatic as to leave no doubt in the mind of the juror as to the unequivocal repudiation by the court of the erroneously admitted matter, and even then, in a case where the testimony is evenly balanced or contradictory, courts hesitate to sanction such withdrawal, though it seems absolutely necessary to permit this course in some instances."

3. The defendant contends that there was no evidence to warrant an instruction on manslaughter; but this assignment of error will not be examined, because it does not appear that the bill of exceptions contains all the evidence received at the trial, nor is it shown that all the evidence bearing upon the question of the degree of the homicide is set forth: *State* v. *Lee Yan Yan,* 10 Or. 365; *Thomas* v. *Bowen,* 29 Or. 258 (45 Pac. 768); *State* v. *Magers,* 35 Or. 520 (57 Pac. 197); *Carney* v. *Duniway,* 35 Or. 131 (57 Pac. 192, 58 Pac. 105); *State* v. *Jancigaj,* 54 Or. 361 (103 Pac. 54).

The judgment is reversed and the cause is remanded for a new trial.      REVERSED AND REMANDED.

MR. CHIEF JUSTICE MOORE and MR. JUSTICE McBRIDE concur.

MR. JUSTICE BURNETT delivered the following, concurring specially, opinion:

I readily agree to the able discussion of Mr. Justice HARRIS and his conclusions upon the two questions treated by him in the foregoing opinion. I am not in accord, however, with his refusal to consider the assignment of error based on the Circuit Court's instruction about manslaughter. The defendant's exception rests upon the postulate that there was no evidence in the case to justify a verdict of guilty of manslaughter. Section 171, L. O. L., as amended by Laws of 1913, Chapter 332, declares the rule for framing a bill of exceptions thus:

"No particular form of exceptions shall be required. The objection shall be stated with as much evidence, or other matter, as is necessary to explain it, but no more; provided, however, that the bill of exceptions may consist of a transcript of the whole testimony and all of the proceedings had at the trial, including the exhibits offered and received or rejected, the instructions of the court to the jury, and any other matter material to the decision of the appeal."

The amendment embodied in the proviso is not mandatory, and does not require absolutely that in all instances a full report of the proceedings and testimony shall be incorporated into or attached to the bill of exceptions. Moreover, we have ruled several times that a bill consisting of a *verbatim* rehearsal of all the testimony will be considered only for the purpose of determining the correctness of the trial court's decision on motions for nonsuit and directed verdict: *Redsecker* v. *Wade,* 69 Or. 153 (134 Pac. 5, 138 Pac. 485); *Keady* v. *United Railways,* 57 Or. 325 (100 Pac. 658, 108 Pac. 197); *West* v. *McDonald,* 67 Or. 551 (136 Pac. 650); *Willis* v. *Horticultural Fire Relief,* 69 Or.

293 (137 Pac. 761, Ann. Cas. 1916A, 449); *Abercrombie* v. *Heckard,* 68 Or. 103 (136 Pac. 875); *National Council* v. *McGinn,* 70 Or. 457 (138 Pac. 493).

The bill of exceptions is, in effect, the authoritative statement that so much of the evidence as is necessary to explain the exception is included in the bill. The document would acquire no additional force from a certificate of the trial judge in so many words that it quoted all the testimony on the disputed point. We are not at liberty to assume that he has violated his statutory duty by leaving out some testimony necessary or helpful in explaining the defendant's assignment of error. The cases cited by Mr. Justice Harris are not in conflict with this view when carefully analyzed. The sole question is: By what means shall the issue on the appellant's exceptions satisfactorily be made to appear? The Code says by a bill of exceptions, in which is contained so much and no more of the testimony as may be necessary to explain the exception. We ought not to import into the statute an additional requirement, and demand that the trial judge shall in effect certify that he has not violated his official duty by omitting matters material to the issue on appeal, yet such is the effect of holding that, after he has made up the bill, he must go further and declare that all has been said and there is nothing more to be included in the statement. The presumption is that he regularly performed his official duty in compiling the bill. If, consequently, there had been anything else bearing upon the point involved, the judge, in duty bound, would have embodied it in the bill. I am of the opinion, therefore, that the document contains sufficient data to require of us consideration and decision upon the propriety of giving any instruction about man-

slaughter. To hold otherwise is to invite the abomination of Plethoric bills of exceptions, which we have so often condemned, and which do so much to cloud issues and prolong litigation.

There are several kinds of manslaughter defined by our Code; Killing upon a sudden heat of passion, caused by an apparently irresistible provocation; death of a person caused by the negligence of the accused; assisting another to commit self-murder; producing abortion upon a pregnant woman; administration of a lethal drug by an intoxicated physician; and, in general, every killing of a human being not murder in any degree, if the same is not justifiable or excusable: Sections 1897–1902, L. O. L. Taking the bill of exceptions as authentic, there is no reasonable viewpoint disclosed from which we can discern any theory of the evidence meeting any Code definition of manslaughter. Taught by the record before us, the conclusion is plain that the defendant was either guilty of willful murder or was entitled to an acquittal. The instruction about manslaughter was a pure abstraction, not justified by any evidence. It invited the jury into the realm of mere speculation and guesswork. It disregarded the rights of the defendant, by exposing him to a danger not involved in the case, to wit, a haphazard verdict, without foundation in testimony. In addition to numerous decisions that abstract instructions constitute reversible error, this court has applied the doctrine to cases of homicide in *State* v. *Magers,* 35 Or. 520 (57 Pac. 197) ; *State* v. *Megorden,* 49 Or. 259 (88 Pac. 306, 14 Ann. Cas. 130) ; *State* v. *Caseday,* 58 Or. 429 (115 Pac. 287).

For this additional reason, the decision of the Circuit Court in the instant case ought to be reversed.