### A. L. KIRBY v. STATE.

No. A-3948.    Opinion Filed June 16, 1923.
Rehearing Denied Dec. 4, 1923.
(220 Pac. 74.)

(Syllabus.)

1.  **Appeal and Error—Discretion of Court—Order Granting or Refusing Change of Venue.** The granting or refusing of a change of venue is in the discretion of the trial court, and this court will not reverse the judgment, unless it clearly appears that there has been an abuse of such discretion.

2.  **Evidence—Character Evidence as to Trait Involved in Charge Always Admissible—Evidence of Bad Character in Rebuttal of Good Character.** A defendant's general good character or reputation as to the trait involved in the charge against him is always admissible in his favor to evidence the improbability of his doing the act charged, and where a defendant offers testimony to show his previous good character the state may in rebuttal offer evidence of his bad character.

3.  **Witnesses—Defendant as Witness in Own Behalf—Credibility at Issue.** When a defendant elects to testify in his own behalf, he occupies a double position. As a defendant his character cannot be attacked by the state; as a witness he puts his credibility at issue like any other witness.

4. **Witnesses—When Evidence as to Reputation for Truth and Veracity not Warranted.** In a criminal trial the mere fact that a witness' testimony is contradicted by adverse testimony does not warrant the introduction of evidence as to his reputation for truth and veracity.

5. **Witnesses—Defendant Testifying in His Own Behalf—Evidence Sustaining Reputation for Truth and Veracity Inadmissible, When.** In a criminal trial where the defendant testifies as a witness in his own behalf and is not impeached, and his credibility is not attacked, except by contradiction of his testimony by other witnesses, evidence sustaining his reputation for truth and veracity is not admissible.

Appeal from District Court, Delaware County; A. C. Brewster, Judge.

A. L. Kirby was convicted of manslaughter in first degree, and he appeals. Affirmed.

Hunt & Beauchamp, and J. Wythe Walker, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

DOYLE, J. In the information in this case, filed in the district court of Delaware county, A. L. Kirby was charged with the crime of murder, alleged to have been committed in said county on or about the 26th day of September, 1920, by killing one Boone Crawley, by shooting him with a pistol. Upon his trial the jury found him guilty of manslaughter in the first degree and fixed the punishment at imprisonment in the penitentiary for the term of 10 years. From the judgment rendered in pursuance of the verdict he appeals. The defense was justifiable homicide.

The evidence shows that Crawley and Kirby were neighbors and lived about one-half mile apart on the same road; that there was a dispute existing between them relative to the right to open and use a certain section line as a road

that Kirby had planted a crop on; that four months before the killing in connection with this dispute, Crawley and Kirby had engaged in a difficulty, and Crawley struck Kirby with a wagon spoke; that in the afternoon of the day of the homicide, Crawley had hauled a load of cane to a mill near by and returning drove through the gate into his place, and was fastening the gate when Kirby rode up on a horse and shot him with a pistol, firing five or six times. One bullet entered just to the right of the backbone at the twelfth rib and came out at the junction of the third rib with the breastbone at a point higher up than where it entered. Another bullet entered just above the left hip in what doctors call Petit's triangle, and came out about an inch and a half to the right and an inch below the navel; this wound ranged down. From the effects of these wounds he died at 11 o'clock the next morning.

The only witnesses to the transaction were the parties concerned and Crawley's wife. She testified:

"My husband hauled a load of cane to the mill on Wolford's place. About 4 o'clock I was sitting in the house and saw my husband driving in a walk towards the gate. A little later I heard two or three shots. I went to the door and saw Mr. Kirby sitting on his horse with a smoking pistol in his hand. He was near the north end of the gate and his horse was facing south. The team and wagon were inside the gate. My husband called to me to bring him a gun. I walked across the room to get the pistol, and I heard two or three more shots fired. As I went out the door, Mr. Kirby turned his horse and rode north towards his home. I went to my husband and found him lying as one dead. I called to him. He could not answer me. My children were over in the field. I started after them, and stopped and called to them, but I could not make them hear me. Then I called to my neighbors and went back to my husband. He was lying about 15 steps inside the gate. The gate was

made of pine planks and opened out to the road. It fastened with wire, and was about 200 yards from the house. The team ran away.''

It appears that one bullet passed through the second board from the top of the gate. It entered from the outside and ranged down. The preponderance of testimony tends to show that two shots were fired in quick succession, then a pause followed by three or four shots. Crawley's dying declarations were to the effect that Kirby shot him; that he was inside the gate, fastening it at the bottom, when Kirby shot him in the back.

As a witness in his own behalf, Kirby testified:

''I had been to Row, and came back by a sale. I saw Crawley ahead of me in a wagon and slowed up because I didn't want to pass him. He stopped and opened the gate and took his horses by the bits and led them in. Then he shut it back and stood with his back to the gate and watched me as I was coming. He said, 'How are you, sir?' I pulled my horse out to the side of the road, and he says: 'Go to hell, you son of a bitch! You made me pay a fine, I am going to hammer your damn brains out.' And he stooped down and grabbed a rock and threw it at me. I dodged it. He stooped down again and grabbed a rock that seemed to be tight in the ground, and I shot at him. I think there was four loads in the pistol, but there possibly might have been five. I fired the shots to protect my life or my body from serious injuries. About four months before I had trouble with him, and he hit me with a wagon spoke on the side of the face. He was fined for it by justice of the peace at Jay. A few days before he hit me with the club, I met him tragedy to view the same.

In accordance with a stipulation of the parties, the court directed and the jury were conducted to the scene of the in the wood pasture. He had an open knife in his hand and asked me if I had seen any hogs. I told him no, and I kept out of his way.''

The first assignment is: "Error of the court in refusing to grant a change of venue."

When the case was called for trial, appellant filed his duly verified petition in proper form for a change of venue, which was supported by the affidavits of nine citizens of the county. The state contested the application and called ten witnesses, and after hearing the proof and argument, pro and con, the court overruled the application.

It has been repeatedly decided by this court that the granting of a change of venue is, under the statute (Comp. Stats. 1921, § 2628), discretionary with the trial court, and unless it clearly appears that there is abuse of such discretion, this court will not reverse the judgment for the failure of the trial court to grant a change of venue. Warren v. State, 24 Okla. Cr. 6, 215 Pac. 635, and cases therein collated.

There is nothing in the record to indicate that the court acted arbitrarily, and it appears that there was no difficulty in securing a fair and impartial jury. Considering the verdict rendered by the jury, there can be no doubt of the fact that the court did not abuse its discretion in refusing to grant a change of venue.

All other assignments of error are based upon exceptions taken to rulings of the court excluding evidence offered by the defendant.

The defendant offered to show by seven different witnesses that each of them knew "the general reputation of the defendant in the community in which he lived for truth and veracity, and that defendant's general reputation for truth and veracity in that community was good." To this evidence the state objected; the court sustained the objection; the defendant duly excepted. Upon this subject the court gave the following instruction:

"You are instructed that the general reputation of the defendant in the community in which he lives for truth and veracity is presumed under the law to be good."

It is argued that the only direct evidence controverting the dying declaration was the testimony of the defendant; hence it became very material to the defendant to show his good reputation for truth and veracity, and that he was entitled to something more than a mere presumption, that he was entitled to make proof of the fact that his reputation was good. In support of this contention counsel cite two cases. Friel v. State, 6 Okla. Cr. 532, 119 Pac. 1124; Smith v. State, 20 Okla. Cr. 362, 202 Pac. 1046.

In the Friel Case it is held that—

"Where the testimony of a witness is contradicted in the trial of a cause, it is competent, for the purpose of supporting his testimony, to introduce evidence as to the general reputation of the witness for truth and veracity."

In the Smith Case it is said: .

"The testimony of the defendant was directly in conflict with the testimony of the witnesses for the state, and, where the veracity of a witness is in any manner called in question, his reputation for veracity may be sustained by proof of his general reputation for truth and veracity."

A defendant's general good character is always admissible in his favor to evidence the improbability of his doing the act charged. After the defendant has attempted to show his good character in his own aid, the state may in rebuttal offer as evidence his bad character. When a defendant elects to testify in his own behalf, he occupies a double position. As a defendant, his character cannot be attacked by the state; as a witness, it can be. The law is that a defendant taking the stand as a witness may, as a witness, be impeached precisely like any other witness.

· The question as to when and under what conditions a witness may be corroborated by evidence of good character for truth and veracity is one upon which there is a wide divergence of judicial opinion, and we think it would be useless to attempt to reconcile the many judicial decisions upon this question. However, there are a few general principles which pervade all the adjudicated cases, and these have been carefully stated and learnedly considered by eminent text-writers on evidence:

Prof. Wigmore says:

"The accused may at any time offer his own good moral character, for the trait in question, as evidence that he did not commit the crime. But he may not as witness offer his good character until it has been attempted to be impeached by the prosecution." Wigmore, Ev. § 891.

And in section 1104 the same author says:

"Good character for veracity is as relevant to indicate the probability of truth telling as bad character for veracity is to indicate the probability of the contrary. But there is no reason why time should be spent in proving that which may be assumed to exist. Every witness may be assumed to be of normal moral character for veracity, just as he is assumed to be of sanity. Good character, therefore, in his support is excluded until his character is brought in question and it becomes worth while to deny that his character is bad.

"It has been said, to be sure, by a few courts that where, without actually introducing testimony, the opponent has effectively insinuated the witness' impeachment, his good character is then proper in rebuttal. But this extension is exceptional and perhaps strained. Moreover, the exception when an accused in a criminal case takes the stand is apparent only; for it is as an accused that he may offer his good character in chief, and that character must concern the trait involved in the charge; and thus since only his character for veracity can affect him as a witness, his evidence of character at that state will not usually be the same as that which he could later offer in his own support as witness.

"The question thus always arises, under this general rule: When is the witness' character brought into question by the opponent, so as to open the way to evidence of good character in denial? This must depend on the nature of the opponent's impeaching evidence. It may be a direct assault on the witness' character, in which case no doubt exists. But it may be evidence of a doubtful or ambiguous import,—for example, of bias, of a prior self-contradiction, of an error of fact, and so on through the whole series of kinds of discrediting evidence. It is obvious that the theory of each of these kinds of evidence must be considered before it can be said whether it affects the witness' character."

As to whether such evidence is receivable to strengthen the testimony of a witness merely because he has been contradicted by an adverse witness, the same author, in section 1109, says:

"The mixed arguments of logic and policy for rejecting it are seen in the following passages: * * *

"1884, Walker, J., in Tedens v. Schumers, 112 Ill. 263, 266: 'If the practice sanctioned the calling of witnesses to prove general character whenever a witness is contradicted, it would render trials interminable. The greater portion of the time of courts would be liable to be engaged in the attack and support of the characters of witnesses. If permitted, each of the contradicting witnesses would have the same right; and not only so, but all of the supporting witnesses on each side contradicting each other would be entitled to the same privilege. It is thus seen that the rule must be limited to cases where witnesses are called to impeach the general character of a witness; otherwise, instead of reaching truth by the verdict, it would tend to stifle it under a large number of side issues calculated to obscure and not to elucidate them.'

"1884, Holmes, J., in Gertz v. Fitchburg R. Co., 137 Mass. 77, 78: 'The purpose and only direct effect of the (im-

peaching) evidence are to show that the witness is not to be believed in this instance. But the reason why he is not to be believed is left untouched. That may be found in forgetfulness on the part of the witness, or in his having been deceived, or in any other possible cause. The disbelief sought to be produced is perfectly consistent with an admission of his general character for truth, as well as for the other virtues; and until the character of a witness is assailed, it cannot be fortified by evidence.'

"No court favoring admission seems to have attempted a reasoned justification of its policy; and the great majority of jurisdictions agree in excluding such evidence."

Prof. Greenleaf, in volume 3, § 469 (15th Ed.), of his work, says:

"Where evidence of contradictory statements by a witness, or of other particular facts, as, for example, that he has been committed to the house of correction, is afforded by way of impeaching his veracity, his general character for truth being thus in some sort put in issue, it has been deemed reasonable to admit general evidence that he is a man of strict integrity and scrupulous regard for truth. But evidence that he has on other occasions made statements similar to what he has testified in the cause is not admissible unless where a design to misrepresent is charged upon the witness in consequence of his relating to the party or to the cause, in which case it seems it may be proper to show that he made a similar statement before the relation existed. So, if the character of a deceased attesting witness to a deed or will is impeached on the ground of fraud, evidence of his general good character is admissible. But mere contradiction among witnesses examined in court supplies no ground for admitting general evidence as to character."

Underhill says:

"The direct impeachment of a witness by any of the means which have been above explained creates an issue respecting his general character for truthfulness. Evidence to

support this and to show that he is a person in whose testimony the jury may have confidence is, therefore, relevant. But evidence of reputation is not relevant merely because there is a contradiction between adverse witnesses, or because the credibility of a witness is shaken on cross-examination, though its admission in such cases may not be reversible error. A distinction has sometimes been made by which it has been held that general evidence of the character of the witness for truthfulness is not relevant if he was impeached merely by showing that he had made contradictory statements. This distinction is repudiated by a majority of the decisions which support the proposition that general evidence of the character of the witness as a truthful person is always admissible whenever any attempt, though it may have been unsuccessful, has been made to impeach it, as for example, where another witness is asked what is his character for truth and replies it is good." Underhill on Evidence, § 352.

And in section 243, in his work on Criminal Evidence, the same author says:

"It has been held that a party should not be permitted to prove that his witness was a man whose reputation for veracity was good, where the impeachment consisted wholly of evidence that the witness had made contradictory statements out of court. But the majority of the cases repudiate this distinction. It is now held almost universally that evidence to show that the reputation of the witness for veracity is good may be introduced whenever the evidence of the witness has been impeached in any way, whether by his contradictory declarations or by a direct attack upon his character.

"But evidence that a witness enjoys a reputation for truthfulness is not receivable to strengthen his testimony merely because he has been contradicted by an adverse witness, or because he has been shaken or confused on cross-examination."

In Bradner on Evidence, § 16, it is said:

"Testimony to support the character of a witness cannot be given in evidence unless the credibility of the witness is impeached."

Jones says:

"It has sometimes been held that, where proof has been offered of the inconsistent or contradictory statements of a witness, his credit may be sustained by proof of his good reputation for truth and veracity; that since the object of the attack is to impeach the witness, the mode of such attack is immaterial, and the same reason exists for sustaining the witness as where witnesses are called to testify to his bad reputation. But it is the better view, and one sustained by the weight of authority, that in such cases the witness cannot be fortified by evidence of good character. Although the contradiction in his statements may tend to show that he ought not to be believed in the particular case, this does not necessarily touch his general good character for truth or integrity, since the inconsistency may be the result of mistakes or forgetfulness. On the same principle, and perhaps for stronger reasons, it is no ground for the introduction of evidence to sustain the character of a witness that other witnesses have contradicted him by testifying a different state of facts, and this remains true although the contradiction is of such a character as to incidentally impute immorality or crime." Jones on Ev. vol. 3, § 871.

Judge Elliott, in his work on Evidence (volume 2, § 995), says:

"When the reputation of a witness for truth has been impeached, the party calling a witness has a right to call other witnesses to prove that his reputation is good. Good character, it has been held, may be shown where the witness has been impeached by proof of conviction of crime. But this principle is not always applied, at least where there is no real attack by way of impeachment. If the witness has been impeached by proof that he made contradictory and inconsistent statements out of court, some of the cases allow his

good character to be shown in corroboration, while others refuse to admit such testimony. However, to render testimony of good character competent and admissible in support of the witness, an attack must necessarily have been made on his character."

In the well-considered case of First National Bank of Bartlesville v. Blakeman, 19 Okla. 106, 91 Pac. 868, 12 L. R. A. (N. S.) 364, the question is discussed with convincing ability. Chief Justice Burford in the opinion said:

"The weight of modern authority seems to classify the cases in which evidence of general reputation in support of a witness is admissible practically as follows: First, where there has been a direct attack upon the character of the witness by offering evidence tending to show that his general reputation for truth and veracity is bad. This rule is universal and unquestioned. Second, where the witness has been impeached by evidence of particular acts of criminal or moral misconduct, either on cross-examination or by record of conviction. While this rule is not universally adopted by the American courts, it is supported by the following cases: Lewis v. State, 35 Ala. 386; People v. Ah Fat, 48 Cal. 61; People v. Amanacus, 50 Cal. 233; State v. Fruge, 44 La. Ann. 165; Vernon v. Tucker, 30 Md. 456; Russell v. Coffin, 8 Pick. (Mass.) 143; Gertz v. Fitchburg R. Co., 137 Mass. 77; People v. Rector, 19 Wend. (N. Y.) 569; Carter v. People, 2 Hill (N. Y.) 317; People v. Gay, 7 N. Y. 378; Stacy v. Graham, 14 N. Y. 492; Webb v. State, 29 Ohio St. 358; Wick v. Baldwin, 51 Ohio St. 51; Warfield v. Ry. Co., 104 Tenn. 74; Smith v. Tate (Tex.) 50 S. W. 363; Lutterell v. State (Tex.) 51 S. W. 930; Paine v. Tilden, 20 Vt. 554; George v. Pilcher, 28 Gratt. (Va.) 299; Reynolds v. R. R. Co., 92 Va. 400; Clarke v. State (Ga.) 43 S. E. 853; Clark v. Bond, 29 Ind. 555; Warfield v. L. & N. Ry. (Tenn.) 55 S. W. 304. Third, impeachment by evidence of corruption on the part of the witness in connection with the case in which he appears. Fourth, impeachment by evidence of contradictory or inconsistent statements admitted on cross-

examination or shown by the testimony of other witnesses. Upon this last rule the authorities are in irreconcilable conflict, and are about equally divided, but the better reason seems to favor the right to corroborate the witness, whose evidence is in this manner discredited, by allowing proof of his general reputation for truth and veracity. Hodge v. Gooden, 13 Ala. 718; Holly v. State, 105 Ala. 100; Mercer v. State, 40 Fla. 216; McEwen v. Springfield, 64 Ga. 159; Clark v. State, 117 Ga. 254; Paxton v. Dye, 26 Ind. 394; Clem v. State, 31 Ind. 418; Board v. O'Conner, 137 Ind. 622; State v. Boyd, 38 La. Ann. 374; Davis v. State, 38 Md. 15; People v. Rector, 19 Wend. (N. Y.) 583; Isler v. Demy, 71 N. C. 14; Burrell v. State, 18 Tex. 713; Street v. Sherman, 21 Vt. 23; Stevenson v. Gunning, 74 Vt. 601; State v. Stoley, 45 W. Va. 198.

"There are other particular cases in which, in the exercise of a wise discretion, the trial court may properly allow evidence of general reputation of a witness in support of such witness, but there must be some special or particular element introduced into the case by the adverse party by which such witness is impeached or discredited. But the foregoing rules embrace the general classes of cases in which such practice is allowable."

In the note to this case the editor states:

"The authorities are nearly unanimous in holding that the mere fact that a witness' testimony is contradicted by opposing testimony does not warrant the introduction of evidence as to his reputation for truth and veracity."

The following cases sustain this rule: Funderberg v. State, 100 Ala. 36, 14 South. 877; Turner v. State, 124 Ala. 59, 27 South. 272; Bell v. State, 124 Ala. 94, 27 South. 414; People v. Bush, 65 Cal. 129, 3 Pac. 590; State v. Ward, 49 Conn. 429; Bell v. State, 100 Ga. 78, 27 S. E. 669; Presser v. State, 77 Ind. 274; Morrison v. State, 37 Tex. Cr. R. 604, 40 S. W. 591; Rutherford v. State (Tex. Cr. App.) 67 S. W. 100; State v. Louie Hing, 77 Or. 462, 151 Pac. 706.

Our investigation leads us to conclude that where a defendant in a criminal action elects to testify as a witness in his own behalf, and where his credibility is not attacked, except by contradiction of his testimony, evidence sustaining his reputation for truth and veracity is not admissible. In so far as the cases of Friel v. State, supra, and Smith v. State, supra, and the case of Gilbert v. State, 8 Okla. Cr. 329, 127 Pac. 889, conflict with this rule, they are overruled.

In the present case the defendant became a witness in his own behalf, and, to support his testimony, offered to prove by witnesses that he was a man of good character for truth and veracity. The fact that his testimony conflicted with that of witnesses for the state gave him no right to introduce evidence of his good character for truth and veracity, and the court did not err in rejecting the same. If the defendant desired to avail himself of good character, to be considered by the jury in connection with the other evidence in determining the question of his guilt or innocence, he should have offered evidence of his good character as a peaceable and law-abiding citizen.

We have examined the other assignments and find no error in any of the rulings assailed by them, and find none of them having sufficient merit to warrant any further discussion.

Finally, after a careful consideration of the whole case, we are forced to conclude that under the evidence the defendant might well have been convicted of murder. As to the self-defense theory, the physical facts conclusively show that the testimony of the defendant is wholly incredible. We think the jury were exceedingly lenient in fixing both the degree of the crime and the punishment. As shown by the record, the defendant had a fair and impartial trial under the laws of the state.

The judgment of the district court of Delaware county is therefore affirmed.

MATSON, P. J., and BESSEY, J., concur.